Kenneth J. THOMAS, Plaintiff,

v.

ISTAR FINANCIAL, INC. and
Ed Baron, Defendants.

No. 05 Civ. 606(VM).

United States District Court,
S.D. New York.

Sept. 7, 2007.

David T. Azrin, Gallet Dreyer & Berkey, LLP, New York, NY, for Plaintiff.

Alan Jonathan Trafimow, David O. Simon, Steven M. Latino, Barry A. Guryan, Robyn Kim Ruderman, Epstein, Becker & Green, P.C., New York, NY, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Kenneth J. Thomas ("Thomas") brought this action against his former employer, iStar Financial, Inc. ("iStar") and iStar's Vice President of Administration and Operations, Ed Baron ("Baron")(collectively, "Defendants"), alleging unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. and the New York City Human Rights Law ("NYCHRL"). Following a trial lasting approximately three weeks, the jury returned a verdict in favor of Thomas on his claim of retaliatory termination, and found for Defendants on his claim of discriminatory termination. The jury awarded Thomas both compensatory and punitive damages. Thomas was awarded $190,000 in back pay, $250,000 in front pay, and $3,500 in non-economic compensatory damages. Additionally, the jury found that iStar should pay $1.6 million in punitive damages and that Baron should pay $22,500.

After the verdict, Defendants renewed their motion pursuant to Federal Rule of Civil Procedure ("FRCP") 50(b), for judgment as a matter of law, which the Court had previously denied at the close of evidence. Defendants also moved pursuant to FRCP 59 for a new trial both because they believed a juror who was excused during deliberations had prejudiced the jury's decision and because the verdict was seriously erroneous and against the weight of evidence. Finally, Defendants moved for a new trial or in the alternative, remittitur, with respect to the jury's awards of damages. The Court denied Defendants' FRCP 50(b) motion for the reasons it had previously articulated on the record on several occasions. The Court also denied Defendants' motion for a mistrial with respect to the excused juror for the reasons explained on the record. However, the Court indicated that it would review the front pay and punitive damages award and would entertain a motion for remittitur, or in the alternative, a new trial. Consequently, the Court stayed entry of judgment until all post-verdict issues regarding damages were adequately resolved.

At a subsequent post-trial conference on July 20, 2007, the Court gave further explanation for its denial of Defendants' FRCP 50(b) motion, emphasizing its finding that there was a sufficient temporal nexus between Thomas's complaints of racial discrimination and his subsequent termination to support the jury's finding of unlawful retaliation. This decision supplements the Court's findings and conclusions on that issue.

At the July 20 conference, the Court also made some preliminary observations indicating its position on the relevant factors and case law that would inform its review of the jury's front pay and punitive damage awards. Thomas also at that time requested that the Court award him prejudgment interest. The Court gave the parties the opportunity to attempt to reach an agreement on these open damages issues in light of its guidance. No agreement was reached.

Thus, for the reasons set forth below, Defendant's motion for remittitur is GRANTED and the jury's awards of front pay and punitive damages against iStar

are remitted as also detailed. Additionally, Thomas is awarded prejudgment interest on the jury's back pay award.

## I. DISCUSSION

### A. JUDGMENT AS A MATTER OF LAW: TEMPORAL NEXUS BETWEEN THOMAS'S COMPLAINTS AND THE ADVERSE EMPLOYMENT ACTION

■■■ Judgment as a matter of law following a jury verdict, pursuant to FRCP 50(b), should be entered only when "there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant].'" *Logan v. Bennington College Corp.*, 72 F.3d 1017, 1021 (2d Cir.1995) (*quoting Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir.1994)). Moreover, in a motion pursuant to FRCP 50(b), a trial court "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 16 (2d Cir.1993). A jury verdict is not to be set aside unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable triers of fact could have reached." *Id.* at 14 (*quoting Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)).

The Court has already considered the numerous arguments on which Defendants moved for judgment as a matter of law, both as to Thomas's retaliation claim and the damages available, and has indicated its findings on the record that reasonable and fair minded jurors could in fact have found for Thomas on his retaliation claim and could in fact have found that Thomas was entitled to the various damages awarded by the jury. However, one of Defendants' arguments requires further attention and discussion.

In their motion, Defendants argue that the significant interval between Thomas's complaints of racial discrimination and his termination from iStar undermines any inference of a causal connection between his good faith complaints and his termination sufficient to establish a claim of retaliation.

Thomas first complained to Geoff Dugan, iStar's Vice President for Human Resources and General Counsel, about racially inappropriate comments by Baron, and that Baron was targeting black people, in August of 2001. (*See* Tr. 173:7.) Subsequent to that meeting, Thomas testified that he heard Baron tell Tracey Griffith ("Griffith") and then Amy Carlson ("Carslon") that he (Baron) had to "get rid of" Thomas. (*See* Tr. 183:18–184:6.) A year later, in August or September of 2002, Thomas complained to Andrew Barker ("Barker") and Ayanna Shanks ("Shanks") about comments made by Jai Agrawal ("Agrawal") suggesting that Thomas's future at iStar was limited. (*See* Tr. 185:18–25.) Defendants emphasize that it was not until the following August, a year after his last alleged complaint, that Thomas was fired.

■■ It is true that claims of retaliation are often dismissed "when as few as three months elapse between the protected [ ] activity and the alleged act of retaliation." *Henderson v. New York*, 423 F.Supp.2d 129, 143 (S.D.N.Y.2006) (*citing Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y. 1999).) However, the line of cases requiring a very close temporal nexus between

the complaints and adverse employment action are all cases where the plaintiff is relying exclusively on a temporal nexus to establish the causation element of a prima facie case. *See, e.g., Johnson v. Nicholson,* No. 05 cv 2740, 2007 WL 1395546, at *6 (E.D.N.Y. May 11, 2007) ("If a plaintiff is relying on temporal proximity alone, the temporal relationship between the protected activity and the adverse action must be very close."). Generally, however, a plaintiff can establish a causal link either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gilford v. City of New York,* No. 03 cv 0091, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004).

■ Here, Thomas has presented other evidence that Defendants harbored retaliatory animus such that reliance on a close temporal connection is not necessary for a reasonable jury to find a causal connection between his complaints of discrimination and his termination. Specifically, there was testimony that Baron stated that he would get rid of Thomas after Thomas complained. Agrawal also allegedly stated to Thomas after Thomas complained about his comments that he didn't care what Thomas said since he was on a "five year plan anyway." (Tr. 188:8–10.) Where there is such direct evidence of retaliatory animus, a close temporal connection between complaints and adverse employment action is not as critical. *cf. Walter v. Westdeutscher Rundfunk,* No. 03 Cv. 5676, 2004 WL 1052776, at *9 (S.D.N.Y. May 11, 2004) (although year elapsed between complaint and termination, where direct evidence of defendant's retaliatory animus was alleged, plaintiff could establish a causal connection sufficient to survive a motion to dismiss).

Moreover, there is evidence that Baron, who knew of Thomas's complaints against him, sought to have Thomas fired well before his actual termination. Barker, Thomas's direct supervisor, testified that Baron had suggested on at least two occasions that Thomas be terminated. (*See* Tr. 842:16–21.) The jury may well have determined, based on the evidence presented, that Baron and Agrawal were intent on seeing Thomas fired as of when he complained but that it was not until August of 2003 that a sufficient opportunity to play a significant role in Thomas's termination, and thus effectuate their retaliatory intentions, presented itself. *cf. Coates v. Dalton,* 927 F.Supp. 169, 170 (E.D.Pa.1996) (although four years elapsed between plaintiff's complaints and his challenged non-promotion, "as no evidence was presented at trial that an earlier opportunity for promotion existed, the jury could have inferred that plaintiff was denied a promotion on the very first possible occasion following his [protected] activity.").

Thus, the Court reiterates its denial of Defendant's FRCP 50(b) motion with respect to liability for retaliation.

## B. *REMITTITUR*

■ Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *TVT Records v. Island Def Jam Music Group,* 279 F.Supp.2d 413, 456 (S.D.N.Y.2003) (citations omitted). "If the Court determines that the verdict is excessive it should remit the jury's award to the maximum amount that would not be excessive." *Id.* Here, the Court must determine whether the front pay and punitive damage awards against iStar are excessive under the facts of this case.

### 1. *Front Pay*

■ As already discussed with the parties during the course of the trial, the

Court agrees with Thomas's counsel, that under state human rights law, unlike Title VII, front pay is a legal remedy to be decided by the jury. *See Epstein v. Kalvin–Miller Intern, Inc.*, No. 96 cv 8158, 2000 WL 1761052, at *1 (S.D.N.Y. Nov.29, 2000) ("[F]ederal courts sitting in New York and applying New York law have ruled that frontpay is a jury question under the [New York State Human Rights Law]."); *see also Shannon v. Fireman's Fund Ins. Co.*, 136 F.Supp.2d 225, 228 n. 3(S.D.N.Y.2001). Under Title VII, front pay is unquestionably an equitable remedy to be decided by the Court. *See Vernon v. Port Auth. of N. Y.*, 220 F.Supp.2d 223, 236 (S.D.N.Y.2002). The Court acknowledged this tension during trial when it addressed the parties' disagreement over whether front pay should be submitted to the jury.[1]

■ Under Title VII, whether and in what amount to issue front pay is left to the sound discretion of the Court. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir.1996). However, since in this case the jury verdict made no distinction, the Court can consider the entire award of damages as if it were allocated to Thomas's claim under the NYCHRL. *See Singleton v. City of New York*, No. 05 cv. 7769, 2007 WL 2219334, at * 2 (S.D.N.Y. Aug.3, 2007). To the extent it is bound by the jury's award of front pay under the NYCHRL, because the Court has serious concerns regarding the amount awarded given the facts of this case, the Court will consider remittitur of the front pay award under the NYCHRL, and will do so in accordance with New York state law. New York law requires that the Court grant remittitur "when a jury award 'deviates' materially from what would be reasonable compensation." *Id.* (*citing* New York Civil Practice Law and Rules ("N.Y.C.P.L.R.") § 5501(c)).

■ In determining that the jury's front pay award herein is excessive, and what would be reasonable compensation instead, the Court has considered that numerous witnesses testified and numerous exhibits were introduced detailing a substantial number of errors Thomas made over a considerable period of time, all indicating that Thomas's job performance was not stellar, and that iStar managers had expressed frustration consistent and significant enough to raise legitimate doubt about the reasonable duration of Thomas's remaining employment with the company. Most significantly in this regard, the COO of iStar, Tim O'Connor ("O'Connor"), made clear it was his opinion that Thomas's job performance was sub-standard and that Thomas should have been terminated well

1. The Court notes that it is not aware of any federal or New York state court cases specifically addressing whether front pay is equitable or legal under the NYCHRL. Defendants cite to several New York City Commission of Human Rights decisions which seemingly indicate that under the NYCHRL the Commission considers front pay to be an equitable remedy. *See e.g., Colon v. Del Bus. Sys. Inc.*, Compl. No. E91–0215/16f–91–0293, 1996 WL 34386933 (N.Y.C. Hum. Rights Nov. 2, 1996) ("Front pay is an equitable remedy, the granting of which is within the sound discretion of the trial judge.") (citing Federal Title VII cases). Defendants' point out that the Commission's interpretation of the statute under which it functions is entitled to deference. *See In re Nelson*, 304 A.D.2d 20, 757 N.Y.S.2d 41, 44 (N.Y.A.D. 1 Dept.2003). The Court notes, however, that it would be difficult to reconcile a state law treating a remedy that derives from the state constitution (trial by jury) as legal and a city law in that state treating that same remedy addressing the same unlawful conduct as equitable. Moreover, whatever level of deference an interpretation of the law by an administrative agency may be due, such statutory construction cannot be equated to a ruling by a court.

before August 2003, and that he had so urged Thomas's immediate supervisor.

Moreover, the evidence at trial, particularly the testimony of Collette Tretola ("Tretola"), Thomas's supervisor at the time of his termination, made clear that as a consequence of iStar's rapid expansion, the demands on Thomas's position as Accounts Payable Manager were ever increasing; and with the passing of the Sarbanes–Oxley law, which subjected the company to higher standards in their accounting practices, what may have been an acceptable level of performance in Thomas's first few years with iStar clearly would not have not been acceptable as the company moved forward. (*See* Tr. 626:19–25.)

Additionally, the Court cannot overlook that Thomas held himself out to iStar as having a college degree in accounting when in fact he had completed only two years of college, a misrepresentation that under appropriate circumstances could have afforded the company sufficient independent grounds to terminate Thomas's employment at some point subsequent to the actual discharge in August 2003. While the Court must conclude that the jury made the factual determination that this after-acquired evidence of Thomas's misrepresentation regarding his educational background would not in and of itself have resulted in his termination in 2003,[2] it is nonetheless relevant evidence that Thomas's job qualifications were not what he held them out to be and is a fact the Court cannot ignore in determining what is an appropriate and reasonable verdict under these circumstances. Thomas's position at trial was that he was unable to find comparable employment because iStar would not give him a recommendation and because Tretola's husband (who worked in the accounting personnel placement industry) poisoned the accounting job market for Thomas. However, that Thomas actually lacks an accounting degree and knowingly misrepresented that he possessed one also likely impact his ability to obtain comparable employment and thereby to fully mitigate his damages. iStar should not be indefinitely responsible for Thomas's inability to fully mitigate his damages because his credentials were in fact not what he held them out to be.

Finally, it is Thomas's own testimony that had he not been terminated, he would have closed in late 2003 on the purchase of a home in Middletown, New York, a significant distance from iStar's office in New York City, resulting in a commute to work of approximately two to three hours each way. Defendants' economic expert, Christopher Erath ("Erath"), cited to 2000 census information which indicated that only 2.8 percent of the population endure commutes of greater than 90 minutes each way. (Tr. 1513:4–6.) This evidence provides some guidance as to the likelihood that Thomas, a single parent with custody of young child, would have continued working at iStar for the period projected in the jury's verdict.

In light of substantial issues raised regarding the quality of Thomas's job performance and misrepresented qualifications, as well as the significant commute Thomas would be faced with on a daily basis, to say that Thomas was likely to have remained at iStar if not for his retal-

---

**2.** At Defendants' request, the jury was specifically instructed on the "after-acquired evidence" doctrine as set forth in *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 359, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (finding front pay not an appropriate remedy where an employer later discovers evidence of wrongdoing by an employee "of such severity that the employee would in fact have been terminated on those grounds alone if the employer had known of it at the time of the discharge.").

iatory termination for a significant number of years after his termination in August 2003 is both unduly speculative, not sufficiently grounded on a preponderance of the evidence, and arguably puts Thomas in a better position than if he had not been fired. *cf. Munday v. Waste Mgmt. of N. Am.*, 858 F.Supp. 1364 (D.Md.1994), *rev'd on other grounds*, 126 F.3d 239 (4th Cir. 1997) ("Front pay should ... not be awarded, unless, in the discretion of the Court, it produces an appropriately equitable result .... [even if defendant had not engaged in pattern of retaliatory conduct, plaintiff's] own inabilities to get along with other people would ... have resulted in her not being able to stay with such employment for long.").

■ Whether classified as a legal or equitable remedy, the purpose of front pay is to make victims of discrimination whole, not to place the plaintiff in a better position than he would have occupied had he not been fired. *See Reed*, 95 F.3d at 1182; *see also Hill v. Airborne Freight Corp.*, Nos. 97 cv 7098, 98 cv 6249, 2003 WL 366641, at *4 (E.D.N.Y. Feb.20, 2003) ("Because of the potential for windfall, the use of front pay must be tempered....."). Under the facts of this case, it is the Court's view that the jury's substantial *back* pay award, which implicitly assumes that Thomas would have remained at iStar for an additional four years after his termination—from August 2003 to the jury's

verdict in July 2007—goes along way to making Thomas whole.

The Court cannot discern with exact certainty through what date the jury concluded that Thomas was entitled to front pay, but taking the numbers suggested by Thomas's own economic expert, Albert Ovedovitz ("Ovedovitz"), the jury clearly extended front pay well into 2010—more than three years.[3] If the jury credited any of the challenges to Ovedovitz's figures identified by Erath, then the jury's award extends even beyond 2010. As the jury's back pay award was less than the amount suggested by Ovedovitz,[4] the jury likely made similar downward adjustments in calculating front pay, making it likely that the jury awarded front pay beyond 2010.

In light of the evidence at trial, a finding that Thomas would remain at iStar at least until 2010—seven years beyond his actual termination—is unduly speculative, and not sufficiently supported by the trial evidence. *cf. Hine v. Mineta*, 238 F.Supp.2d 497, 501 (E.D.N.Y.2003) (where evidence indicated that plaintiff had problems that would inhibit job performance unrelated to the hostile work environment, determining the length of her service as an air traffic controller "would be purely conjectural").

■ If front pay is appropriate, a year or two is the most this Court would deem reasonable. Front pay must consider the ability of the plaintiff to mitigate damages in the future. *See Fernandez v.*

---

**3.** Ovedovitz's stated that Thomas's estimated future loss was: $32,000 for the remainder of 2007; $72,481.91 for 2008; $81,865.14 for 2009; and $92,197.12 for 2010. As the jury specifically requested guidance on reducing these figures to present value, the parties provided the jury with a worksheet, allowing the jury to multiply lost wages by a number that the parties agreed would accurately reduce the figures to present value. The multipliers were: .979 for 2007; .960 for 2008; .921 for 2009, and .884 for 2010. Adding up the yearly future estimated loss reduced to present value

for each year up and to and through 2010, yields a total of $257,809.67, which is the ascertainable number that most closely approaches the $250,000 awarded.

**4.** Through 2006, Ovedovitz concluded Thomas's estimated lost earnings to be $205,372.91. This figure does not count half of 2007. The jury's award of $190,000 in back pay thus indicates it made downward adjustments to Ovedovitz's projections.

*North Shore Orthopedic Surgery & Sports Medicine, P.C.,* 79 F.Supp.2d 197, 204 (E.D.N.Y.2000). Factors to be considered in determining front pay include the age of the plaintiff and his reasonable prospects of obtaining comparable employment. *Id.* Thomas was only 47 at the time of trial and had significant work experience in the accounting field. The evidence at trial indicated that in spite of the challenges Thomas faced in mitigating his damages, his earnings substantially increased each year post termination by iStar, from $16,204 in 2004 to $38,887.00 in 2006. As the separation from iStar recedes in time, it is reasonable to conclude that its effect on Thomas's ability to secure and maintain comparable future employment would lessen—the numerous accounting placements, although temporary, that Thomas has had since leaving iStar provide more and more opportunities for him to create positive recommendations and new chances for permanent employment. In light of the considerations discussed above, an additional two years from the present "is a reasonable allotment of time in which [Thomas] could be expected to find employment comparable to that which he lost at [iStar]." *Id.; see also Hill,* 2003 WL 366641 at *5 (because court believed plaintiff was capable of finding employment closely matching his former employment in light of his education and abilities, and noting that a front pay award should not be unduly speculative, court awarded one year differential between former and current salary); *Brenlla v. LaSorsa Buick Pontiac Chevrolet, Inc.,* No. 00 cv 5207, 2002 WL 1059117, at *11 (S.D.N.Y. May 28, 2002) (though court found that plaintiff had no reasonable prospect of finding alternative employment in the near future owing to downturn in economy, and de-

spite that she had diligently attempted to mitigate damages, the Court affirmed an award equal to one year of front pay, noting anything greater would be unreasonable and unduly speculative). In this case projecting beyond one, or at the most two years, that Thomas would not have obtained sufficiently comparable employment is, in this Court's opinion, simply too speculative to allow.

■ In determining an appropriate front pay award, the Court follows the "least intrusive standard," wherein the "remitted amount should reduce the verdict only to the maximum that" the Court would uphold as not excessive. *Earl v. Bouchard Transp. Co. Inc.,* 917 F.2d 1320, 1330 (2d Cir.1990). In determining the maximum limit that is reasonable, the Court will be guided by the jury's back pay award. The jury award of $190,000 in back pay covered approximately four years. Dividing the award by four produces an average annual back pay award of $45,000. As an award of two years front pay is the maximum this Court finds to be reasonable, using the figures set by the jury's back pay award as guideline, the Court finds $90,000 to be an appropriate starting point. While Ovedovitz projected continued salary increases for Thomas going forward, as indicated, Thomas's actual earnings substantially increased over the last three years as well, thus the Court's analysis assumes that Thomas's actual earnings would increase at a rate similar to what Ovedovitz projected his earnings to be had he remained at iStar. The $90,000 figure, however, should be reduced to present value, in accordance with the multipliers agreed to by the parties. After reducing to present value, the Court finds a remittitur of the jury's front pay award to $85,950.00[5] to be appropriate.

**5.** As two years of front pay would extend midway through 2007 to midway through

2009, the present value deduction calculations, *see supra* n. 3 setting forth multipliers,

## 2. *Punitive Damages*

■ While the Court does not contest the jury's factual determination that punitive damages are warranted as to both iStar and Baron, the amount awarded against iStar is clearly excessive in light of the facts and circumstances of this case. In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court set forth three guideposts for a court to consider in reviewing a punitive damages award: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 575, 116 S.Ct. 1589; *see also State Farm Mut. Auto. Ins. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (reiterating importance of *Gore* guideposts). These guideposts underscore the Court's conclusion that the jury's punitive damage award is excessive.

■ First, in assessing the degree of reprehensibility of defendants' conduct, the court must consider whether certain "aggravating factors" generally associated with highly reprehensible conduct are present. Those factors include "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir. 1996). This is not a case involving violence or the threat of violence. However, the jury, in order to find punitive damages

are as follows: $22,500 × .979 = $22,027.50 for half of 2007; $45,000 × .960 = $43,200 for 2008; $22,500 X .921 = $20,722.50 for

were warranted, had to find that defendants' conduct was more than merely negligent. In light of iStar's failure to formally investigate Thomas's discrimination claim and in light of Dugan's decision to suggest Baron be present to witness Thomas's termination, and of Tretola's choosing to consult, in deciding to discharge Thomas, two other employees, Carlson and Agrawal, who had some personal reasons for wanting Thomas terminated, iStar's conduct can certainly be characterized as more than mere negligence. Additionally, evidence was presented at trial that Baron had "targeted" other black employees and that some of those employees did complain with no action being taken. Thus, there is certainly sufficient evidence of reprehensible conduct to warrant a punitive damage award. However, the reprehensibility should not be overstated. As mentioned, there was no threat of violence to Thomas. Also, there was no finding by the jury that Defendants had intentionally discriminated against Thomas or that iStar's top management, such as O'Connor, or Tretola, the ultimate decision maker with respect to the termination, were directly motivated by retaliation.

With respect to the second *Gore* guidepost, the ratio of punitive to compensatory damages in this case is between 3:1 and 4:1. There are certainly circumstances when a 4:1 ratio would be appropriate. *See State Farm,* 538 U.S. at 425, 123 S.Ct. 1513. ("In *Haslip,* in upholding a punitive damage award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. We cited that 4–to–1 ratio again in *Gore.*") (internal citations omitted). However, in

half of 2009. Adding these three figures totals $85, 950.00.

*State Farm* the Supreme Court also noted that while "low awards of compensatory damages may properly support a higher ratio than high compensatory awards ... The converse is also true ... When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

Here, the Court believes the ratio in this case is excessive because Thomas was awarded a very substantial amount in compensatory damages, making a punitive award equal to the compensatory damage award more appropriate.

Additionally, the jury's award of punitive damages is not in line with the federal statutory caps on punitive damages. *See* 42 U.S.C.1981a (b)(3)(A) (imposing a $50,000 cap on a respondent who has fewer than 101 employees "in each of 20 or more calendar weeks in the current or preceding calendar year," a $100,000 cap on a respondent with 100 to 20 employees, a $200,000 cap on a respondent with 200 to 500 employees, and a $300,000 cap on a respondent with over 500 employees). Under the NYCHRL, unlike Title VII, there is no cap on punitive damage awards. *See Zimmerman v. Assocs. First Capital Corp.,* 251 F.3d 376, 384 (2d Cir.2001). However, the federal cap nonetheless provides guidance on what is considered an appropriate civil penalty for comparable misconduct. *See Lamberson v. Six West Retail Acquisition, Inc.,* No. 98 cv 8053, 2002 WL 59424, at *7 (S.D.N.Y. Jan.16, 2002)(reducing $400,000 punitive damage award in a retaliation case to $30,000).

Most significantly, the jury's award is not in line with the punitive damages awarded in similar cases by this Court or other courts in this Circuit. In *Parrish v. Sollecito,* 280 F.Supp.2d 145, 164 (S.D.N.Y. 2003), the jury found for plaintiff on her retaliation claim but not on her hostile work environment sexual harassment claim and awarded $500,000 in punitive damages. This Court reduced the award to $50,000, both because that was the relevant statutory cap and because it determined that an award of more than $50,000 was excessive under the Fourteenth Amendment.

In *Fernandez,* 79 F.Supp.2d at 208, the jury awarded plaintiff $100,000 in punitive damages on his claim of retaliatory termination, which the court reduced to $50,000, again both because that was the relevant statutory cap and because the court found a higher figure would be excessive. Numerous other decisions in this circuit support the Court's conclusion that under the facts of this case, the jury's award of $1.6 million in punitive damages is grossly excessive. *See Rivera v. Baccarat,* 10 F.Supp.2d 318, 332–33 (S.D.N.Y.1998)(finding $ 375,000 award of punitive damages in a Title VII and ADEA termination case excessive and remitting to $40,000), *rev'd on other grounds,* 205 F.3d 1324 (2d Cir. 2000); *Mahoney v. Canada Dry Bottling Co.,* No. 94 cv 2924, 1998 WL 231082 (E.D.N.Y. May 7, 1998) (finding $650,000 punitive damages award excessive and remitting to $100,000 where there was a finding the defendant specifically instructed its district manager to treat plaintiff differently because plaintiff filed an EEOC charge and where defendant failed to follow up on EEOC charge); *Ettinger v. State Univ.,* No. 95 Cv 9893, 1998 WL 91089 (S.D.N.Y. March 2, 1998) (remitting $150,000 punitive damages award against three individuals to $2,000 each, finding $50,000 award per person greatly exceeded the amount necessary to deter defendants); *Iannone v. Harris, Inc.,* 941 F.Supp. 403, 413–15 (S.D.N.Y.1996)(remitting $ 250,000 punitive damages award to $50,000 where no finding of discrimination but only retaliation which included retalia-

tory discharge); *Kim v. Dial Serv. Int'l, Inc.*, No. 96 cv 3327, 1997 WL 458783 (S.D.N.Y. Aug.11, 1997) (finding $725,000 punitive damages award excessive and remitting to $25,000; finding degree of reprehensibility for discrimination based on race low and determining award of front and back pay punitive in nature).

In light of the foregoing, the Court concludes that a punitive sanction of $190,000 against iStar, reflecting both the relationship to the compensatory award of back pay and the Title VII statutory caps, "would be maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles." *TVT Records*, 279 F.Supp.2d at 461. Accordingly, the punitive damage award against iStar should be remitted to $190,000.

## C. *PREJUDGMENT INTEREST*

 Thomas seeks an award of prejudgment interest on his back pay damages. The decision to award prejudgment interest is left to the sound discretion of the court. *See Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir.1998). It is ordinarily an abuse of discretion not to award prejudgment interest on a award of lost wages. *Id.* at 874 ("Awarding pre-judgment interest ... prevents the defendant employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages ... and helps to ensure the plaintiff is meaningfully made whole."). The Court finds "an award of prejudgment interest on plaintiff's back pay award is appropriate in this case, because it serves to compensate the plaintiff for loss of the use of money wrongfully withheld through an unlawful discharge." *Kirsch v. Fleet Street, Ltd.*, No. 92 cv 932, 1996 WL 695687, at *1 (S.D.N.Y. Dec.4, 1996) (citations omitted).

While New York law provides for a 9 percent annual rate of interest, *see* N.Y.C.P.L.R. § 5004, when "a judgment is based on violations of both federal and state law, courts in this circuit uniformly have applied a federal interest rate, most commonly based on the average rate of return on one-year Treasury bills ("T-bills") for the relevant time period." *Kuper v. Empire Blue Cross and Blue Shield*, No. 99 cv 1190, 2003 WL 23350111, at *3 (S.D.N.Y. Dec.18, 2003) (citing numerous cases).

 Thus, the appropriate rate of interest that will be applied here is the federal interest rate based on the average rate of return on one-year Treasury bills for the relevant time period between the time the claim arises until the entry of judgment pursuant to 28 U.S.C. § 1961(a). *See Levy v. Powell*, No. 00 cv 4499, 2005 WL 1719972, at * 3(E.D.N.Y. July 22, 2005) (citations omitted). Calculating the award should be done as follows:

> First, the award [ ] should be divided pro rata over the appropriate time period. Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied. Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.

*Robinson v. Instructional Systems, Inc.*, 80 F.Supp.2d 203, 208 (S.D.N.Y.2000) (citations omitted). Thus, the Clerk of Court is directed to use this methodology to calculate the interest on the back pay award of $190,000 from August 27, 2003 to the date judgment is entered.

## II. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendants iStar Financial Inc. ("iStar") and Ed

Baron ("Baron") (collectively "Defendants") for a new trial is granted, unless plaintiff Kenneth Thomas ("Thomas") elects to remit the front pay award and punitive damage award against iStar determined by the jury after trial, to the following amounts: $85,950 award of front pay, and $190,000 award of punitive damages against iStar; and it is further

ORDERED that Thomas's election shall be filed with the Court and served on Defendants within ten (10) days of this Order; and it is further

ORDERED that preliminary judgment, subject to Thomas's election as set forth above, be entered in accordance with the jury's verdict on the issue of liability for retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. and the New York City Human Rights Law ("NYCHRL") and on the jury's award of the following damages: (a) back pay damages in the amount of $190,000, (b) non-economic damages in the amount of $3,500, and (c) punitive damages in the amount of $22,500 against Baron; and it is further

ORDERED that Clerk of Court is directed to award pre-judgment interest using the methodology set forth above on the back pay award of $190,000 from August 27, 2003 to the date that judgment is entered.

SO ORDERED.