No. 13-0470 - <u>Manor Care, Inc. et al v. Tom Douglas, individually and on behalf of the Estate of Dorothy Douglas</u>

**FILED**

**June 18, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, dissenting:

I am not surprised that the majority attempts to hide its shockingly result-oriented analysis in a seventy-two page tome. Unfortunately for the majority, the fractured vote of this Court casts a glaring spotlight on the startlingly misguided reasoning employed throughout. Justice Sandra Day O'Connor wrote that "[i]ndeed, the point of . . . the law in general–is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991) (O'Connor, J., dissenting). Without question, the biases and whims of the majority are on full display in its boldly tortured analysis. When the majority so plainly usurps the discretion afforded to West Virginia juries, substituting its own policy judgments for theirs, how can any citizen be confident that their fate rests in a jury of their peers rather than three members of this Court? Furthermore, when this Court disregards not only the United States Supreme Court's long-standing punitive damages jurisprudence, but its own precedent, how can any entity doing business in West Virginia be expected to "order [its] behavior"?

1

In this case, the majority recognizes that the trial court permitted improper claims to be presented to the jury but rather than remanding for a new trial, simply reduces the jury's verdict according to its own perceptions of what the verdict should have been without any legal basis for its conclusions. The majority goes so far as to vacate an entire $1.5 million in damages simply because it claims not to understand the "nature and purpose" of the award. Further, the majority upholds the 7:1 punitive to compensable damages ratio, concluding that it is constitutionally permissible, despite the substantial due process deprivation its excessiveness represents. Because the verdict form submitted to the jury contained non-viable causes of action, lacked any sense of clarity or order permitting review, and because the punitive damages award clearly fell outside of what has been recognized as acceptable by this Court, as well as the United States Supreme Court, I would have reversed the decision of the circuit court and remanded for a new trial. Accordingly, I dissent.

The underlying circumstances in this case are undeniably tragic. Given that this case was tried to a jury, which unquestionably found liability for Ms. Douglas's death rested with the defendants, I will not rehash the evidence and second-guess its conclusion. I have the utmost respect for the jury's deliberations and therefore, for purposes of this separate opinion, accept its conclusions as true. To that end, I note that my opinion regarding the verdict is in no way a reflection of the monetary value to be placed upon Ms. Douglas's life, her family's grief, or my personal feelings regarding the reprehensibility of the

2

defendants' proven conduct. Rather, I am constrained by the faithful application of the governing rules of law and, unlike the majority, refuse to succumb to a haphazard attempt to intuit the jury's intentions on damages.

### *Flawed Verdict Form*

Although I agree with the majority's conclusion that the $5 million award for breach of fiduciary duty was erroneous inasmuch as such a cause of action does not lie in this case and that the $1.5 million award for violation of the Nursing Home Act ("NHA") was error,[1] simply vacating the damages awards tied to these improper legal theories of recovery merely compounds the error and effectively results in this Court sitting as post-verdict jurors. Because the verdict form contained non-viable causes of action, *the damages for which were identical to those sought under the viable wrongful death/negligence theory*,[2] one cannot summarily discard those damages awards along with the erroneous legal theories without doing serious disservice to the jury's verdict. This is perhaps most apparent from the

---

[1]In that regard, I whole-heartedly agree with Justice Workman's analysis of the majority's misplaced reasoning as to this issue, as set forth in her concurrence.

[2]The jury was instructed on four theories of recovery: violation of the Nursing Home Act, breach of fiduciary duty, non-medical negligence, and medical negligence. It was then separately instructed on the various types of damages it could award: *McDavid* damages, wrongful death damages, and punitive damages. Rather than itemizing these types of damages on the verdict form to track what the jury was instructed, the verdict form permitted the jury to award non-specific "damages" for three different theories. Violation of any one of the four theories, however, provides for recovery of the exact same damages as the other theories. *See*, *infra*, note 3.

3

majority's telling statement that "the verdict form and instructions are so lacking in lucidity" that it is "unable to address, with any clarity, the issues" surrounding one of the claims. This revealing statement merely underscores the obvious: we simply cannot know what amount the jury intended to award as damages in this matter given the inartful drafting of what can only be viewed as an abominable verdict form. Specifically, the majority cannot know whether the jury intended to award $11.5 million in compensatory damages for the pre-death injuries and wrongful death of Mrs. Douglas, but simply divided this amount between the respective line items presented on the flawed verdict form. This is not a situation where the jury has made a demonstrable calculation error or even *mistakenly* awarded duplicative damages,[3] such that this Court could remit the verdict with confidence that the legal errors have been corrected while preserving the jury's discretion in awarding damages. Rather, in this case, the jury awarded various sums for unspecified damages caused by the defendants' conduct, but was *forced* to attribute those damages to legally deficient causes of action due to the confusing and erroneous verdict form.

---

[3]Of course, as Justice Workman correctly concludes, all three damages awards made by the jury in this matter were duplicative of one another since Mrs. Douglas's death was the culmination of a single injury event, i.e. there was but one injury resulting in death. This, however, was not a jury error; rather it was precipitate by the design of the respondents' verdict form and position on the damages recoverable under each theory. This argument fully illustrates the point–we simply cannot know whether the jury intended to award an aggregate of $11.5 million in compensatory damages or if it (erroneously) perceived differing damages for each legal theory presented since each theory was erroneously tied to a separate damages award in the flawed verdict form.

4

And, yet, the problems with this verdict form do not end there. The verdict form obfuscated a critical element of damages and permitted the jury to make a direct award to wrongful death beneficiaries. Although the respondents claim that the damages awards for breach of fiduciary duty and violation of the NHA represented *McDavid* [4] conscious pain and suffering damages, *all* of the jury instructions (including those for non-medical and medical negligence) on the various theories of recovery instructed the jury to award damages for *injury* to Dorothy Douglas proximately caused by defendants, making those damages indistinguishable from the wrongful death damages. Damages for conscious pain and suffering are merely an element of damages recoverable under a wrongful death claim; nowhere on the verdict form was there a plainly designated line item for such damages. Moreover, respondents provide no support for the notion that any particular causes of action are specifically limited to "injury" as opposed to "death" damages or that the jury was clearly instructed on that issue from which one could presume that the now-vacated awards under those items were for *McDavid* damages. As noted, the verdict form permitted the jury to award damages directly to "Tom and Carolyn Douglas" rather than the Estate of Dorothy Douglas–unmistakably erroneous under our wrongful death statute.

---

[4]Syl. Pt. 6, *McDavid v. U.S.*, 213 W. Va. 592, 548 S.E.2d 226 (2003) ("Under the wrongful death act, *W. Va. Code*, 55-7-6 [1992], a jury's verdict may include damages for the decedent's pain and suffering endured between the time of injury and the time of death, where the injury resulted in death but the decedent did not institute an action for personal injury prior to his or her death. To award damages for pain and suffering, there must be evidence of conscious pain and suffering of the decedent prior to death.").

In short, the verdict form in this matter was an inscrutable mess. The only way to correct this error is to remand for a new trial on damages. Contrary to the majority's disposition, this Court has previously remanded cases where the verdict was occasioned by a verdict form and instructions that were confusing and inconsistent. In a case cited by the majority–*Lively v. Rufus*, 207 W.Va. 436, 445, 533 S.E.2d 662, 671 (2000)–we reversed and remanded for similar reasons, stating that:

> [T]he circuit court abused its discretion in submitting to the jury an interrogatory that was inconsistent with and contradictory to the law and the jury instructions, and otherwise obtuse. Furthermore, we find this to be a reversible error. *See Ingram v. Earthman*, 993 S.W.2d 611, 641 (Tenn. Ct. App. 1998) ("Reversal is required . . . when the special verdict form is confusing or inconsistent with the trial court's instructions."), *cert. denied*, 528 U.S. 986, 120 S.Ct. 445, 145 L.Ed.2d 362 (1999); *Janke v. Duluth & Northeastern R.R. Co.*, 489 N.W.2d 545, 549 (Minn. Ct. App. 1992) ("A trial court commits reversible error by giving inconsistent and contradictory instructions on a material issue.... In this case, the trial court's instructions on damages and the damages portion of the special verdict form were inconsistent and confusing. . . . We conclude that because the instructions on damages were inconsistent and contradictory, a new trial on damages is required.") (internal citation omitted).

*See also Hall v. Ashley*, 607 F.2d 789, 791 (8th Cir. 1979) (remanding for new trial based on fact that "[a]lthough it appears the jury found a constitutional wrong, the . . . overall form of the verdict is inconsistent and confusing and makes it difficult to determine what the jury actually intended."); *Potter v. American Bean & Grain Corp.*, 388 N.W.2d 22, 25 (Minn. Ct. App. 1986) ("Based on all this potential for jury confusion, this court determines that a

6

manifest injustice would be done if buyer were denied a new trial."); *Conger v. Queen City Food & Vending, Inc*., 591 S.W.2d 161, 165 (Mo. Ct. App. 1979) (ordering new trial where verdict form was "confusing, misleading and erroneous").

For the majority to arbitrarily hew away chunks of the damages that were improperly tied to these erroneous legal theories in the first instance constitutes a gross mishandling of this verdict. At this point, given the number and quality of legal errors that permeate this verdict form, the majority is engaging in absolute guesswork as to a legally appropriate verdict, without having heard an ounce of evidence. It is not for this Court to sit as a super-jury and reductively carve damage awards in the process of attempting to whittle away legal error. Legal errors should have been addressed, resolved, and this case remanded for a new trial on damages under proper instruction of law as to legally supportable theories of recovery, thereby permitting a jury to make a proper award of damages free from uncertainty.

### *Punitive Damages*

In stark contrast to the presumptuous substitution of its own judgment regarding the appropriate amount of compensatory damages, the majority has left untouched the jury's plainly unconstitutional 7:1 punitive to compensable damages ratio that led to an $80 million award. In maintaining the ratio, the majority has utterly disregarded its own

jurisprudence and dangerously flouted the United States Supreme Court's instructions as to the constitutionality of excessive punitive awards. With respect to the constitutionally passable ratio of punitive to compensatory damages, this Court has held:

> The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with *actual evil intention*, much higher ratios are not per se unconstitutional.

Syl. Pt. 15, *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992) (emphasis added). Further, in *Vandevender v. Sheetz, Inc.*, 200 W.Va. 591, 599, 490 S.E.2d 678, 686 (1997), this Court clarified that exceeding the 5:1 ratio established in *TXO* was appropriate only when a defendant was shown to have "intentionally or malevolently committed acts they knew to be harmful." More specifically, the *Vandevender* Court stated that

> Only in those cases where the defendant can be shown to have actually intended to cause harm is the ratio of punitives to compensatories permitted to climb higher without "rais[ing] a suspicious judicial eyebrow." . . . *Simply put, bad or legally incorrect corporate policy is not the equivalent of a mean-spirited, evil intent to cause harm.*

*Id.* at 604, 490 S.E.2d at 691 (emphasis added) (citations omitted). The majority has failed to identify even an iota of evidence suggesting that the petitioners' corporate policy-makers possessed a "mean-spirited, evil intent" to cause Mrs. Douglas's death or acted with "malevolence." *Id.*

8

In the instant case, the majority has ignored its own admonition first established in *TXO* that a 5:1 ratio, at most, is appropriate only when the "compensatory damages are [not] . . . very large[.]" This refusal to acknowledge the substantial nature of the compensatory damages award is particularly egregious in light of the United States Supreme Court's similar directives regarding the constitutionally permissive ratio of punitive damage awards. In *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003), the Supreme Court admonished: "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id*. at 416. (citations omitted). In that regard, the *State Farm* Court stated that "[w]hen compensatory damages are *substantial*, then a lesser ratio, perhaps *only equal to compensatory damages*, can reach the outermost limit of the due process guarantee." *Id.* at 425 (emphasis added). As such, it is clear that the United States Supreme Court has sanctioned, at most, a 1:1 ratio for cases where the compensatory damages are substantial. Quite tellingly, the Supreme Court characterized the $1 million compensatory award in *State Farm*–a mere one-fifth of the *reduced* compensatory damages in the case at bar–as "substantial compensatory damages."

9

The Supreme Court more recently reaffirmed the 1:1 ratio and engaged in a particularly instructive discussion of the national landscape on punitive damages in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).[5] In *Exxon Shipping*, a class action arising from the *Exxon Valdez* disaster, the Supreme Court reviewed a $5 billion dollar punitive award levied against Exxon in favor of a sub-class of plaintiffs seeking punitive damages. The

---

[5]While the *Exxon Shipping* Court stated that the case was decided pursuant to maritime law, rather than constitutional due process, there is no question that its discussion of punitive damages made little to no reference to maritime considerations. As noted by one commentator, limiting the discussion in *Exxon Shipping* to maritime cases only is misguided for the following reasons:

> First, the Supreme Court's reasoning in *Exxon Shipping* rested on broadly applicable principles, not on considerations unique to maritime law, and the concerns it expressed about "the stark unpredictability" of punitive damages awards plainly were not limited to the maritime context. Second, the data from which the Court drew its limit of a 1:1 ratio included all kinds of punitive damages cases, not just maritime cases. Third, the Court repeatedly described punitive damages as a "common law remedy," for which "responsibility lies with this Court as a source of judge-made law in the absence of statute." . . . . Fourth, although stopping short of saying expressly that the 1:1 presumption applies equally to due process review, the Court twice quoted its statement in *State Farm* that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Indeed, the language of the opinion seems to echo due process terminology: The Court repeatedly used words and phrases like "unfairness"; "unpredictability"; "common sense of justice"; and "commonly held notion[s] of law."

4 Bus. & Com. Litig. Fed. Cts. 45.54 (3d ed. 2011).

Court pointed out that research on punitive damage trends nationally indicates that "by most accounts the median ratio of punitive to compensatory awards has remained *less than 1:1*." *Id.* at 497-98 (citing multiple studies reporting median ratios of 0.62:1 to 0.67:1) (emphasis added). Recognizing that "the real problem, it seems, is the stark unpredictability of punitive awards," the Court went on to state that the research also revealed a mean ratio of 2.9:1 and a standard deviation of 13.81, demonstrating the existence and seriousness of "outlier cases" in which the punitives "dwarf the corresponding compensatories." *Id.* at 499-500. Noting that "eliminating unpredictable outlying punitive awards" is a judicial obligation, it found that the most promising option was to "peg[] punitive to compensatory damages using a ratio or maximum multiple." *Id.* at 506.[6] The Court then concluded that "a 1:1 ratio, which is above the median award, is a fair upper limit" and that "a median ratio of punitive to compensatory damages of about 0.65:1 probably marks the line near which cases like this one largely should be grouped." *Id.* at 513.

It bears noting that *State Farm* was decided ten years *after* this Court proclaimed 5:1 the outer limit ratio for non-intentional or malicious conduct. Not only has this Court failed to recognize its duty to revisit this ratio in light of *State Farm's* reduced 1:1

---

[6]The Court further noted, however, in startling contrast to the 7:1 ratio permitted by the majority in the case *sub judice*, that "States that rely on a multiplier have adopted a variety of ratios, ranging from 5:1 to 1:1" or "absolute monetary caps[.]" 544 U.S. at 496. Moreover, "[w]hile a slim majority of the States with a ratio have adopted 3:1, others see fit to apply a lower one[.]" *Id.* at 510.

benchmark, but in the instant case it has opted to blithely enlarge the ratio to 7:1.  Unlike the majority, most other courts have heeded this admonition and appropriately reduced punitive damage awards to a 1:1 ratio where compensatory damages were deemed "substantial," although the cases frequently involved sums far less than the $5 million compensatory award at issue here.  *See Jones v. United Parcel Serv., Inc*., 674 F.3d 1187, 1207 (10th Cir. 2012), *cert. denied*, 133 S.Ct. 413 (2012) (reducing punitive damages from slightly over 3:1 punitive-to-actual damages ratio to 1:1 ratio in part because plaintiff's actual damages of $630,307 were substantial); *Jurinko v. Medical Protective Co.,* 305 Fed. Appx. 13, 30 (3rd Cir. 2008) (reducing 13.1:1 ratio to 1:1 in part because of "substantial compensatory award"); *Bridgeport Music, Inc. v. Justin Combs Pub*., 507 F.3d 470, 490 (6th Cir. 2007) ("Given the large compensatory damages award of $366,939 . . . a ratio of closer to 1:1 or 2:1 is all that due process can tolerate in this case."); *Bach v. First Union Nat. Bank*, 486 F.3d 150, 156-57 (6th Cir. 2007) (finding that where plaintiff had recovered $400,000 in compensatory damages, a 1:1 ratio of compensatory to punitive damages was "the outer boundary of what the Constitution will permit")*; Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding that "substantial compensatory damages award" of over $4 million entered against tobacco company required punitive damages to be reduced to ratio of approximately 1:1); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) (concluding that "large compensatory award" of $600,000 in racial harassment claim "is a lot of money" and reducing punitive damages from 10:1 to 1:1 ratio); *Burton v. Zwicker and*

*Associates, PSC*, 2013 WL 5652646 (E.D. Ky. 2013) (reducing ratio to 1:1 due to "substantial" $350,000 compensatory damages); *Perkins v. Federal Fruit & Produce Co., Inc.*, 2013 WL 2112425 (D. Colo. 2013) (reducing ratio and observing that "[a]lthough Perkins' punitive damages compared to compensatory damages are a single digit ratio, 6.5 to 1, it is a high single digit ratio, especially given the Supreme Court's and Tenth Circuit's recent moves to enforce much smaller, even 1:1, ratios"); *Shukla v. Sharma,* 2012 WL 481796 (E.D.N.Y. 2012) (reducing ratio from 2.5:1 to 1:1); *Zakre v. Norddeutsche Landesbank Girozentrale*, 2008 WL 351662, at *7 (S.D.N.Y. Feb. 8, 2008) (reducing punitive damages award, where ratio was 2:1, because compensatory damages were substantial—$1.65 million); *Slip–N–Slide Records, Inc. v. TVT Records, LLC*, No. 05–21113–CIV, 2007 WL 3232274, at *30 (S.D. Fla. Oct. 31, 2007) (affirming punitive damages award, which had been reduced to reflect 1:1 ratio by the District Court, because the "substantial [compensatory damages award of $2.3 million] mitigates against a punitive damages award that materially exceeds that same amount"); *Thomas v. iStar Fin., Inc.*, 508 F. Supp.2d 252, 263 (S.D.N.Y.2007) ("[T]he Court believes the [3:1 to 4:1] ratio in this case is excessive because Thomas was awarded a very substantial amount in compensatory damages [$443,500], making a punitive award equal to the compensatory damage award more appropriate."); *see also Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 54 (Ky. 2003) (noting "the relatively small amount of compensatory damages awarded" in calculating appropriate ratio); *Clark v. Chrysler Corp.*, 436 F.3d 594 (6th Cir. 2006) (reducing ratio from

13:1 to 2:1 in light of "not overly large" compensatory award of approximately $235,000).

A watchful judicial eye over punitive verdicts is important. Judicial review of punitive awards is simply required by the concept of fundamental fairness–fairness which even the most reprehensible defendant is guaranteed by both the West Virginia and United States Constitutions. The Supreme Court has unequivocally held that the courts have a duty to normalize punitive awards because of "[t]he implication of unfairness that an eccentrically high punitive verdict carries in a system whose commonly held notion of law rests on a sense of fairness in dealing with one another." *Exxon Shipping*, 554 U.S. at 502. The *Exxon Shipping* Court further explained the necessity of "promoting systemic consistency" with regard to punitive awards:

> [A] penalty should be reasonably predictable in its severity, so that even Justice Holmes's "bad man" can look ahead with some ability to know what the stakes are in choosing one course of action or another. And when the bad man's counterparts turn up from time to time, the penalty scheme they face ought to threaten them with a fair probability of suffering in like degree when they wreak like damage.

*Id.* at 502-03 (citations omitted). "Law is defined to be a rule of action; but how can that be a rule, which is little known, and less fixed?" The Federalist No. 62 (James Madison).

Justice Brandeis stated that "[e]xperience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without

14

understanding." *Olmstead v. U.S.*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting). While the majority has reached its disposition under the guise of protecting our most vulnerable citizens, it nonetheless upholds a fatally flawed verdict that has been corrupted by substantial legal errors. By presumptuously reducing that corrupted verdict to reflect its own judgment, I submit that the majority has proceeded down a misguided path littered with the vestiges of our legal system. For these reasons, I respectfully dissent.