

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-24-2008

# Jurinko v. Med Protective Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3519

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Jurinko v. Med Protective Co" (2008). *2008 Decisions*. Paper 46.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/46

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 06-3519 & 06-3666

STEPHEN P. JURINKO; CYNTHIA JURINKO, H/W
as assignees of Paul G. Marcincin,

v.

THE MEDICAL PROTECTIVE COMPANY;
MEDICAL CARE AVAILABILITY AND
REDUCTION OF ERROR FUND,
Successor in interest to or formerly known as
Medical Professional Liability Catastrophe Loss Fund

Medical Protective Company,          Appellant at 06-3519
Stephen P. Jurinko; Cynthia Jurinko, Appellants in 06-3666

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 03-cv-04053
(District Judge: Honorable Cynthia M. Rufe)

Argued January 17, 2008

Before:  SCIRICA, *Chief Judge*, BARRY[*] and ROTH, *Circuit Judges*.

(Filed: December 24, 2008)

---

[*]The Honorable Maryanne Trump Barry participated in the oral argument but discovered facts causing her to recuse from this matter prior to filing of the Opinion. The remaining judges are unanimous in this decision, and this Opinion and Judgment are therefore being filed by a quorum of the panel.

JAMES C. SARGENT, JR., ESQUIRE (ARGUED)
Lamb McErlane
24 East Market Street
P.O. Box 565
West Chester, Pennsylvania 19381

JEFFREY R. LERMAN, ESQUIRE
GLENN F. ROSENBLUM, ESQUIRE
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street, 24th Floor
Philadelphia, Pennsylvania 19109
        Attorneys for Appellant/Cross-Appellee,
        The Medical Protective Company

MARK W. TANNER, ESQUIRE (ARGUED)
Feldman, Shepherd, Wohlgelernter, Tanner & Weinstock
1845 Walnut Street, 25th Floor
Philadelphia, Pennsylvania 19103

MARK B. FROST, ESQUIRE
Frost & Zeff
Pier 5 at Penn's Landing, 2nd Floor
7 North Christopher Columbus Boulevard
Philadelphia, Pennsylvania 19106
        Attorneys for Appellees/Cross-Appellants,
        Stephen P. Jurinko and Cynthia Jurinko, H/W
        as assignees of Paul G. Marcincin

OPINION OF THE COURT

SCIRICA, *Chief Judge*.

Plaintiffs Stephen and Cynthia Jurinko brought a diversity action in federal court alleging bad faith on the part of an insurer, The Medical Protective Company, in a medical malpractice suit Mr. Jurinko brought in state court against Medical Protective's

2

insured, Dr. Paul Marcincin.  A state jury found Dr. Marcincin liable for medical malpractice and awarded Mr. Jurinko $2.5 million in damages, $1.3 million more than Dr. Marcincin's coverage.  In lieu of paying the excess verdict, Dr. Marcincin assigned to the Jurinkos his bad faith claim against Medical Protective for its conduct in the malpractice action.

A federal jury found Medical Protective acted in bad faith and awarded the Jurinkos compensatory and punitive damages, in the amounts of $1,658,345 and $6,250,000 respectively.  The District Court denied Medical Protective's post-trial motions seeking reversal of the jury verdict and a new trial, and then granted in part and denied in part the Jurinkos' motion to mold the verdict, awarding attorneys' fees, costs, and interest.  Both parties have appealed.  We will affirm in part, but will reduce the amount of punitive damages awarded.

I.

*A.*

On July 24, 1992, Stephen Jurinko visited Dr. Paul Marcincin, a dermatologist, at his office in Bethlehem, Pennsylvania.  Jurinko had a dark spot on his nose, which Dr. Marcincin treated topically.  In 1993, the spot returned, and Jurinko visited Dr. Marcincin again.  Dr. Marcincin took a shaved biopsy, which he sent to the SmithKline Beecham Laboratory for pathology analysis.  Dr. Andrew S. Edelman, a SmithKline pathologist, reviewed the sample and issued a report that found no cancer cells but explained that the sample was insufficient to rule out cancer.  A portion of the skin from Jurinko's nose —

3

the base of the epithelium — was not included in the sample. Without it, Dr. Edelman could not conclusively rule out cancer. Despite Dr. Edelman's report explicitly finding the results inconclusive, Dr. Marcincin interpreted the report as ruling out cancer and did not follow up on the missing portion of the sample.

On July 21, 1999, Jurinko again saw Dr. Marcincin because the spot had returned. Dr. Marcincin removed the spot. But in April 2000, Jurinko discovered a lump on his neck. A biopsy revealed it was a lymphatic malignant tumor. Jurinko notified Dr. Marcincin, who contacted SmithKline, requesting the 1993 sample be retested. After reviewing the 1993 sample, SmithKline pathologists detected cancer cells.

### B.

Jurinko filed suit against Dr. Marcincin, Dr. Edelman, and SmithKline. Both Dr. Edelman and Dr. Marcincin had primary malpractice coverage through Medical Protective and statutory excess coverage through the CAT/MCARE Fund.[1] Medical Protective provided Dr. Marcincin with $200,000 in primary coverage, and the CAT Fund provided $1 million in excess coverage.

Because Medical Protective insured both Dr. Marcincin and Dr. Edelman, Medical Protective was obligated to appoint counsel for each physician. Nevertheless, Medical Protective's claims adjuster, James Alff, appointed only one attorney, James Kilcoyne, to

---

[1]The CAT Fund refers to the "Medical Professional Liability Catastrophic Loss Fund." The CAT Fund became the "Medical Care Availability and Reduction of Error Fund," or MCARE Fund, during the course of these events. For relevant purposes here the CAT and MCARE funds are the same.

represent both physicians despite knowing this created a conflict of interest in violation of the Pennsylvania Rules of Professional Conduct. Kilcoyne filed an answer to the complaint on Dr. Edelman's behalf. Kilcoyne represented Dr. Edelman from September 2000 through May 15, 2001, when Kilcoyne withdrew his appearance. Kilcoyne continued to represent Dr. Marcincin for the remainder of the state court litigation.

For its part, the CAT Fund determined it was required to provide primary coverage for Dr. Edelman because the suit was commenced more than four years after the alleged misdiagnosis.[2] Once the CAT Fund accepted Dr. Edelman's defense, it appointed attorney Jack Snyder to represent him.

In December 2001, Mr. Jurinko's attorney, Mark Frost, demanded $4 million but the defendants refused to settle. In a January 2002 post-discovery and pre-trial settlement conference, Court of Common Pleas Judge Sandra Mazer Moss recommended an amount between $1.5 and $2 million.[3] Post-conference, Frost made a new settlement demand of $2 million, which defendants rejected without making a counter-offer. Judge Moss held another conference, which Dr. Marcincin attended. After the conference Dr. Marcincin

---

[2] 40 Pa. Stat. Ann. § 1301.605 provides:
> In the event that any claim is made against a health care provider subject to the provisions of Article VII more than four years after the breach of contract or tort occurred which is filed within the statute of limitations, such claim shall be defended and paid by the [CAT] Fund.

[3] At the time of the settlement conference, there were three defendants in the case: Dr. Marcincin, SmithKline, and Dr. Edelman. Judge Moss recommended each party provide equal contributions.

informed Kilcoyne, in writing, that he wanted to settle. Kilcoyne told Alff, Medical

Protective's claims adjuster, the case should be settled. He explained to Alff that Dr.

Parrish, one of the experts to be called on Dr. Marcincin's behalf, told him that Dr.

Marcincin's "notes were terrible, and could be problematic at the time of trial." There was

also a concern that the jury would be confused by the case's medical complexities.

Despite these concerns, Alff made no further attempt to settle prior to trial.

In April 2002, the case was tried before a jury in the Philadelphia Court of

Common Pleas, Judge Alfred DiBona presiding. Judge DiBona also recommended

settlement, in the amount of $1.6 million. On April 5, the CAT Fund wrote Medical

Protective, requesting it tender its policy. The letter stated:

> As we have discussed, it is the [CAT] Fund's position that Dr. Marcincin's
> exposure in this matter exceeds his primary limits, thus a full tender from
> The Medical Protective Company on his behalf is warranted. Offering
> anything less than a tender on behalf of Dr. Marcincin is in bad faith and will
> adversely affect a global effort to settle this case.

Because the CAT Fund was Dr. Marcincin's excess insurer it could not offer any of its $1

million in a settlement until Medical Protective, the primary insurer, tendered its policy.

But Alff responded that Medical Protective would neither offer the policy limits nor offer

more than $50,000.

Pre-trial, the defendants offered a settlement of $650,000, with Medical Protective

still only willing to contribute $50,000,[4] which Jurinko did not accept. During trial,

_____

[4]SmithKline and the CAT Fund would have each contributed $300,000. While the

(continued...)

6

SmithKline entered into a joint tortfeasor settlement agreement with Jurinko. Only after the trial and verdict did Medical Protective learn SmithKline had paid $525,000 in settlement.

After SmithKline settled, the CAT Fund's counsel, Jack Snyder, discussed with Kilcoyne the possibility of making a settlement offer of $650,000. The CAT Fund would have offered $500,000 on behalf of Dr. Edelman. Snyder asked Kilcoyne if Medical Protective would offer $150,000 on behalf of Dr. Marcincin. Kilcoyne discussed this possibility with Alff, but Medical Protective never offered more than $50,000.

During trial and after Smithkline settled, Jurinko made a final settlement demand on Dr. Edelman and Dr. Marcincin of $1.1 million. Medical Protective refused to settle at this amount and determined the case would likely go to verdict. Kilcoyne believed an adverse verdict would likely be between $750,000 and $1 million. In his notes, Alff wrote that he thought the case was worth $750,000, but would likely settle for $1 million. Frost had authority from Jurinko to accept $1 million. But Alff resolved to "hold tight [at $50,000] and see how this plays out."

---

[4](...continued)
CAT Fund was Dr. Marcincin's excess insurer, any money contributed was on behalf of Dr. Edelman, as his primary insurer. As noted the CAT Fund, as Dr. Marcincin's excess insurer, was incapable of offering any money on behalf of Dr. Marcincin until Medical Protective offered its policy limits.

7

After Frost made the $1.1 million demand, no more demands or offers were made, and the case went to verdict. The jury returned a verdict exonerating Dr. Edelman and finding Dr. Marcincin liable for $2.5 million, $1.3 million above his coverage.

## C.

After trial, Dr. Marcincin assigned to Stephen and Cynthia Jurinko the right to pursue a bad faith claim against Medical Protective in exchange for a release of the excess verdict amount. As noted, the Jurinkos brought suit in federal court, alleging Medical Protective acted in bad faith by appointing Kilcoyne to represent both physicians and by failing to settle the case within policy limits.

Pre-trial, Medical Protective sought to exclude the testimony of attorney James Griffith, the Jurinkos' expert witness, contending his report offered improper opinions on whether Medical Protective acted in bad faith. Griffith was an attorney with great experience defending physicians in medical malpractice cases. The District Court denied the motion. At trial, Griffith testified that "there [was] an inherent conflict right there on the face of the [complaint]" because it alleged Dr. Marcincin was negligent in his treatment and Dr. Edelman was negligent in misreading the slide." He testified the conflict prevented Kilcoyne from mounting a defense that blamed Dr. Edelman and from filing a cross-claim against Dr. Edelman. In Griffith's professional judgment, Medical Protective behaved unreasonably by refusing to tender the policy after multiple judges set a settlement amount above $1.5 million and Dr. Marcincin had consented to settle, and by

8

failing to increase its offer above $50,000.  Griffin said Medical Protective's conduct

caused Dr. Marcincin to suffer an adverse verdict.

Medical Protective's expert witness, attorney Jack Hartman, testified that Medical

Protective reasonably evaluated the case and reasonably managed the settlement

discussions.  Hartman believed the testimony in the bad faith case demonstrated Dr.

Marcincin had reasonably relied on Dr. Edelman, and that the cancer in Jurinko's nose did

not cause the cancer on his neck.  He said Dr. Edelman was the "target defendant," and

therefore Medical Protective's offer reflected the relative apportionment of damages.  He

also said, because the CAT Fund was a "much bigger player," having $1 million in

coverage for Dr. Edelman, and $1 million in excess coverage for Dr. Marcincin, Medical

Protective reasonably "follow[ed] the CAT Fund's lead."

Alff's testimony was particularly damaging to Medical Protective.  He testified that

he acted unreasonably and irresponsibly in settlement negotiations,[5] and that he denied Dr.

---

[5]Mark Tanner, the Jurinkos' attorney in the bad faith case, examined Alff with regard
to settlement negotiations:
Q [Tanner]: [W]hat you were doing, is you were trying to play a negotiating tactic against
the CAT Fund, weren't you?
A [Alff]: Yes.
Q: What you were really doing is you were trying to hold on to a little bit of Medical
Protective's money, because what you wanted to do was sort of scare the CAT Fund into
paying extra money on behalf of Dr. [Edelman] to try and settle the whole case, right?
A: That's correct.
. . .
Q: In other words, even though Dr. Marcincin had exposure and had insurance, you
thought well, if I don't pay it and I'm really unreasonable, then maybe the CAT Fund will
just throw more money in on behalf of [Edelman] and I can save my money, isn't that
(continued...)

9

Marcincin an effective defense by appointing Kilcoyne to represent both physicians and by allowing Kilcoyne to continue representing Dr. Marcincin at trial.[6] But Kilcoyne testified

---

[5](...continued)
right?
A: Yes.
. . .
Q: [I]f your insured, Dr. Marcincin has exposure, and his exposure exceeds $50,000, is it right, is it consistent with your understanding that somebody else should pay for his exposure, like Dr. [Edelman] and his line of coverage, just because you're being unreasonable?
A: No, that's not fair.
Q: But that's what was going on, isn't it?
A: It is.
. . .
Q: And in fairness, looking back, you did not do everything you certainly could to protect the interests of Dr. Marcincin, did you?
A: No.

[6]Alff testified about the conflict and acknowledged he knew Kilcoyne's representation would deprive Dr. Marcincin of a defense and cross-claim.
Q[Mark Tanner, Jurinko's attorney]: [Y]ou were aware of [ethical rules prohibiting clients with adverse interests] when you made the decision to tell Jim Kilcoyne to represent Dr. Marcincin and Dr. Edelman, true?
A[Alff]: True.
. . .
Q: And because Dr. Marcincin over here never got a new lawyer, unlike Dr. Edelman, Dr. Marcincin couldn't say hey, it's Dr. Edelman's fault, I want to go after him, he's the one who should be responsible, true?
A: True.
Q: So, from the earliest moment in the case, your decision to appoint the same lawyer, Jim Kilcoyne, for both Dr. Marcincin and Dr. Edelman, prevented forever Dr. Marcincin from asserting a defense in this case that, hey, it's not my fault, it's Dr. Edelman's fault, true?
A: True.
Q: And you deprived him of that defense within the first [moment] of this claim, correct?
A: Correct.
Q: And you never took any steps such as to get him a knew lawyer that would give him
(continued...)

10

that his representation of both physicians did not create a conflict of interest because he was not prevented from arguing at trial that Dr. Marcincin relied on Dr. Edelman's report.[7] The jury also heard from Dr. Marcincin, Stephen Jurinko, Frost, and two representatives of the CAT Fund.

Both parties submitted jury instructions. The District Court instructed the jury according to Pennsylvania Suggested Standard Civil Jury Instructions § 13.21:

> Failure to offer policy limits does not evidence bad faith where there is no possibility of settlement within the policy limits. There must be an expressed willingness on the part of the third party, the plaintiff in the underlying litigation, at some point in time to accept an offer of the policy limits.

Issuing a general verdict, the jury found for the Jurinkos and returned a verdict of $1,658,345 in compensatory damages and $6,250,000 in punitive damages.

After trial, Medical Protective brought motions renewing its motion for judgment as a matter of law, or in the alternative, for a new trial. Medical Protective argued: (1) the verdict was not supported by adequate evidence that the case would have settled had Medical Protective tendered its policy limits; (2) evidence of Medical Protective's

---

[6](...continued)
that defense back, isn't that right?
A: That's right.

[7]Kilcoyne testified that, while he served as Dr. Edelman's attorney for eight months and filed an answer to Jurinko's complaint on Dr. Edelman's behalf, he did not enter into a confidential attorney-client relationship. He said, "[f]or purposes of getting the case where it should be, [Dr. Edelman] called me on the phone, we talked about it briefly. [Dr. Edelman] was acceptable with it. I told him he was going to get a new attorney shortly."

assignment of Kilcoyne as attorney for Dr. Edelman and Dr. Marcincin was improperly admitted; (3) the amount of punitive damages awarded was excessive and violated due process; (4) the court incorrectly charged the jury with respect to punitive damages; and (5) the judgment erroneously permitted duplicative interest and delay damages.

The District Court denied Medical Protective's motions. The court found the Jurinkos presented sufficient evidence for the jury to find bad faith. Additionally, the Court found Griffith's expert testimony was relevant to the central issues of the trial and therefore properly admitted. It found "it was proper and relevant for Mr. Griffith to provide an opinion as to the ethics of this dual representation, the likely impact on Dr. Marcincin's defense, and whether this action constituted bad faith on the part of Medical Protective." It also found the jury was properly instructed on punitive damages and properly awarded punitive damages, and that the award, with a ratio of less than 4:1, was not unconstitutionally excessive.

Medical Protective filed a motion for reconsideration of the post-trial motion for judgment as a matter of law, which the District Court denied. The Jurinkos filed a motion to mold the verdict to reflect an award of attorneys' fees, litigation expenses, and statutory interest pursuant to 42 Pa. Cons. Stat. § 8371. The District Court awarded attorneys' fees, finding the award was necessary to make the plaintiffs whole. The Jurinkos urged the court to use the percentage-of-recovery method to calculate attorneys' fees, but the District Court found the lodestar method applied because Pennsylvania Rule of Civil Procedure 1716 requires it, and because no court had ever adopted the percentage-of-recovery

12

method in a bad faith case.  After applying the lodestar method, the District Court awarded

$323,167.50 in attorneys' fees.  The court also assessed $15,438.06 in costs, and awarded

additional interest at the rate of prime plus three percent.  The Jurinkos contended that, in

addition to post-verdict interest, they should be awarded $432,482 in statutory interest

under 42 Pa. Con. Stat. § 8371.  The District Court rejected this argument, finding the

parties had stipulated to an award of interest during trial.  The additional awards produced

a total verdict of $8,246,950.56, plus interest.[8]

---

[8]The District Court had subject matter jurisdiction under 28 U.S.C. § 1332.  We have
jurisdiction under 28 U.S.C. § 1291.  Issues involving bad faith are governed by
Pennsylvania law.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Our review of
the District Court's interpretation and application of bad faith insurance law is plenary.
*Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir. 1996).  We exercise plenary review over
orders granting judgment as a matter of law and apply the same standard as the District
Court:

> A motion for judgment as a matter of law under Federal Rule 50(a) should
> be granted only if, viewing the evidence in the light most favorable to the
> nonmoving party, there is no question of material fact for the jury and any
> verdict other than the one directed would be erroneous under the governing
> law.

*Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (internal quotations omitted).
Our review of the District Court's decision upholding the constitutionality of the
amount of punitive damages award is de novo.  *Cooper Indus., Inc. v. Leatherman Tool
Group, Inc.*, 532 U.S. 424, 431, 436 (2001).  We must "engage[] in an independent
examination of the relevant criteria," *id.* at 435, "to determine whether the punitive
damage award is so 'grossly disproportional' to the defendant's conduct as to amount to a
constitutional violation," *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 230
(3d Cir. 2005) (quoting *Cooper Indus.*, 532 U.S. at 434).  We review the reasonableness
of the District Court's award of attorneys' fees for abuse of discretion, *Rode v.
Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990), unless the question is whether the
court applied the correct standard, in which case our review is plenary, *Bd. of Trs. of
Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 508 (3d
Cir. 1992).

II.

Medical Protective contests the jury's finding of bad faith. It contends the evidence

is insufficient to support a finding of bad faith for failure to settle; and with respect to bad

faith in the representation of Dr. Marcincin, it contends the testimony of Plaintiffs' expert,

Griffith, about the conflict of interest was irrelevant or otherwise legally insufficient.

*A. Bad Faith Failure to Settle*

Medical Protective contends the evidence did not support liability for a bad faith

failure to settle. Pennsylvania has long recognized a contractual cause of action for bad

faith conduct on the part of an insurer. *Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223,

229 (Pa. 1957). Pennsylvania also provides a statutory remedy, which permits an insured

to recover interest, punitive damages, court costs, and attorneys' fees. 42 Pa. Cons. Stat. §

8371.[9] Section 8371 does not define "bad faith," but Pennsylvania courts and our court

have recognized the "universally acknowledged meaning":

> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay
> proceeds of a policy; it is not necessary that such refusal be fraudulent. For
> purposes of an action against an insurer for failure to pay a claim, such

---

[9]The statute provides:
> In an action arising under an insurance policy, if the court finds that the
> insurer has acted in bad faith toward the insured, the court may take all of
> the following actions:
> (1) Award interest on the amount of the claim from the date the claim was
> made by the insured in an amount equal to the prime rate of interest plus
> 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.
42 Pa. Cons. Stat. § 8371 (2006).

14

> conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). We have adopted the test the Pennsylvania Superior Court enunciated in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)*,* which requires a plaintiff, to recover under § 8371, to show by clear and convincing evidence that the insurer: "(1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (citations omitted); *Terletsky*, 649 A.2d at 688. "[T]he motive of self-interest or ill will" of the insurer, while not a third element, "is probative of the second element . . . ." *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1190–91 (Pa. Super. Ct. 2007) (internal quotation marks omitted); *see also Employers Mut. Cas. Co. v. Loos*, 476 F. Supp. 2d 478, 490–91 (W.D. Pa. 2007) ("[C]onsiderations of 'the motive or self-interest or ill will' are probative with respect to a refusal to pay being frivolous or unfounded."). The "clear and convincing" standard requires the plaintiff to show the evidence is "'so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re Estate of Fickert*, 337 A.2d 592, 594 (Pa. 1975) (quoting *La Rocca Trust*, 192 A.2d 409, 413 (Pa. 1963)).

An insurer owes a fiduciary duty to its insured and "must accord the interest of its insured the same faithful consideration it gives its own interest." *Cowden*, 134 A.2d at 228. The Pennsylvania Supreme Court explained this standard of care:

> [W]hen there is little possibility of a verdict or settlement within the limits of the policy, the decision to expose the insured to personal pecuniary loss must be based on a bona fide belief by the insurer, predicated upon all of the circumstances of the case, that it has a good possibility of winning the suit. . . . Good faith requires that the chance of a finding of nonliability be real and substantial and that the decision to litigate be made honestly.

*Id*. This standard "requires more than proof of sincerity; the evaluation of the case by the insurance company must be honest, intelligent and objective." *Shearer v. Reed*, 428 A.2d 635, 638 (Pa. Super. Ct. 1981) (citation and internal quotation marks omitted).

Section 8371 is not limited to an insurer's bad faith denial of a claim. Pennsylvania has recognized that an insured may recover against an insurer which, in bad faith, fails to settle on the insured's behalf. *Birth Ctr. v. St. Paul Cos., Inc.*, 787 A.2d 376, 389–90 (Pa. 2001). A failure to settle will constitute bad faith if an insured has acted in its own self-interest:

> [T]here is an inherent conflict of interest between an insurance company and its insured once an offer to settle within policy limits has been received. Whenever the insurance company decides not to settle, it has, in effect, chosen its interests over that of its insured's . . . .

*Shearer*, 428 A.2d at 639.

Medical Protective contends there was no evidence of a demand or expressed willingness to settle within policy limits on the part of Jurinko. The District Court instructed the jury on this point according to Pennsylvania's standard jury instructions:

"There must be an expressed willingness on the part of the third party, the plaintiff in the underlying litigation, at some point in time, to accept an offer of policy limits."[10]

Pennsylvania Suggested Standard Civil Jury Instructions § 13.21. Both parties submitted this instruction. Dr. Marcincin's policy limits, consisting of $200,000 of coverage under

---

[10]We have found no case interpreting Pennsylvania law that has explicitly required an "expressed willingness" on the part of a plaintiff to settle within the policy limits, despite the language of the standard jury instructions. Some states have adopted a bright-line rule in which a plaintiff must make a demand within policy limits in order for an insured to have a claim of bad faith. *See, e.g.*, *Messersmith v. Mid-Century Ins. Co.*, 43 Ca. Rptr. 2d 871, 880 (Cal. Ct. App. 1995) ("Until the insurer is faced with a demand for policy limits, it comes under no duty to evaluate the possibility of an excess judgment."); *Haddick ex rel. Griffith v. Valor Ins.*, 763 N.E.2d 299, 304–05 (Ill. 2001) ("Since Illinois law generally does not require an insurance provider to initiate settlement negotiations, this duty . . . does not arise until a third party demands settlement within policy limits."). Other states do not require the insured to show it made a settlement offer within the policy limits. *See, e.g.*, *Snowden ex rel. Estate of Snowden v. Lumbermens Mut. Cas. Co.*, 358 F. Supp. 2d 1125, 1127–29 (N.D. Fla. 2003) (offer to settle by the claimant is not necessary, but the "unwillingness of a victim to settle" is a defense, although the burden of proof is on the insurer); *Kingsley v. State Farm Mut. Auto. Ins. Co.*, 353 F. Supp. 2d 1242, 1248–52 (N.D. Ga. 2005) (finding, while it is unnecessary for a claimant to make a policy limits offer, an insurer must be "on notice that it has an opportunity to settle"), *aff'd*, 153 F. App'x 555 (11th Cir. 2005).

A bright-line rule requiring a demand within policy limits does not appear to reflect Pennsylvania law or the realities of settlement negotiations. "The event constituting breach of the fiduciary duty to handle settlement negotiations in good faith is the refusal to accept a settlement offer which would be reasonably advantageous to the insured *in the light of all circumstances known at the time*." *LaRocca v. State Farm Mut. Auto. Ins. Co.*, 329 F. Supp. 163, 169 (W.D. Pa. 1971) (emphasis added); *see also Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 82 (3d Cir. 1985) ("An insurance carrier may be required to broach settlement negotiations under some circumstances . . . ."). An insurer's actions may arguably constitute bad faith whether a plaintiff makes a demand within the policy limits or not. Here, we need not reach the question of whether Pennsylvania law imposes a bright-line rule, as the court instructed the jury that an expressed willingness to settle within the policy limits must be shown and the parties do not challenge the instruction.

17

his policy with Medical Protective and $1 million with the CAT Fund, totaled $1.2 million. Frost, Jurinko's attorney, made a demand of $1.1 million. Therefore, Jurinko demonstrated "an expressed willingness" to settle within the policy limits.

The District Court found, and we agree, that the Jurinkos presented sufficient evidence to find a bad faith failure to settle. Alff made it clear Medical Protective "did not have a reasonable basis for" failing to settle "under the policy." *Terletsky*, 649 A.2d at 688. He testified that Medical Protective's refusal to offer more than $50,000 in a settlement was a "negotiating tactic" — Alff thought by refusing to offer more money he could force the CAT Fund to offer more from Dr. Edelman's policy. This refusal demonstrated an abandonment of the fiduciary duty Medical Protective owed to Dr. Marcincin. Medical Protective acted in its own self-interest rather than in the interest of Dr. Marcincin. Such negotiating tactics do not provide a reasonable basis for failing to tender Dr. Marcincin's policy limits.

Medical Protective "recklessly disregarded its lack of reasonable basis," *id.*, for failing to tender the policy limits based on "motive[s] of self-interest," *Greene*, 936 A.2d at 1190. Two different judges put a settlement value on the case of at least $1.5 million, and Alff believed the case was worth $750,000 but would likely settle for $1 million. The CAT Fund's letter informed Medical Protective it was acting in bad faith by failing to tender policy limits. Medical Protective knew the CAT Fund, as Dr. Marcincin's excess insurer, could not offer any money on behalf of Dr. Marcincin in settlement unless Medical Protective tendered its policy limits of $200,000.

18

Medical Protective presented evidence showing it believed, going into the underlying trial, that Dr. Marcincin was not liable. Kilcoyne hired a physician to examine Jurinko's medical records, who found no connection between the cancer on Jurinko's nose and the cancer on his neck. Nevertheless, the evidence still supported a claim for bad faith. "[U]nder Pennsylvania law an insurer does not comply with the good faith standard when it refuses to settle merely because it believes that its insured is not liable for the claim asserted." *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 237 (3d Cir. 2003) (citing *Shearer*, 428 A.2d at 638). Medical Protective cannot satisfy its duty of good faith "merely by showing that it acted with sincerity." *Birth Ctr. v. St. Paul Cos., Inc.*, 727 A.2d 1144, 1156 (Pa. Super. Ct. 1999).

While the other parties — Jurinko, Dr. Marcincin, the CAT Fund, and SmithKline — all were interested in reaching a settlement, Medical Protective would not budge from its initial offer. All the parties, including Medical Protective, knew the case was worth far more than $200,000, but Medical Protective refused to negotiate in good faith, instead engaging in admittedly unfair negotiation tactics. Accordingly, we agree with the District Court that there was sufficient evidence for the jury to find Medical Protective acted in bad faith by failing to offer its policy limits in a settlement.

### B. Bad Faith Representation

Medical Protective contests the finding of liability, contending the jury's verdict could have been based on a finding of bad faith in the representation of Dr. Marcincin and not on a finding of bad faith failure to settle. *See Carden v. Westinghouse Elec. Corp.*, 850

F.2d 996, 1000–06 (3d Cir. 1988) (requiring support for both grounds when a jury verdict could be based on either of two theories). Medical Protective objects to the bad faith representation ground by way of three challenges to the relevancy of expert Griffith's testimony about the conflict of interest: First, it argues an attorney conflict of interest cannot support a claim under the Pennsylvania bad faith statute, and accordingly, the expert testimony about the conflict of interest is irrelevant. Second, it contends no causal connection exists between the conflict of interest and harm to Dr. Marcincin. Finally, it asserts no evidence attributed Kilcoyne's conduct to the insurer. Although Medical Protective contested the relevancy of Griffith's testimony *in limine*, its arguments have changed during the course of the litigation, and we address whether they were properly preserved.

A party failing to raise issues at trial cannot complain about them after trial. *Wilson v. Vt. Castings, Inc.*, 170 F.3d 391, 395 (3d Cir. 1999); *Williams v. Runyon*, 130 F.3d 568, 571–72 (3d Cir. 1997); *see also* Fed. R. Civ. P. 50 cmt. (2006) ("[T]he Rule 50(b) motion . . . can be granted only on grounds advanced in the preverdict motion); *Carden*, 850 F.2d at 1001 n.5 (noting an objection at trial, preserving the issue for appeal). This requirement "ensure[s] that both parties are aware of and can raise dispositive issues earlier in the proceeding rather than later, so that the district court can resolve these issues correctly and without delay." *Runyon*, 130 F.3d at 572. Exceptions to this rule exist only to protect against "fundamental and highly prejudicial error resulting in a miscarriage of justice." *Wilson*, 170 F.3d at 395–96 (citation and internal quotation marks omitted).

20

Medical Protective's motions before and during the trial did not raise the first[11] or second[12] of the arguments it presses on appeal. Medical Protective did raise the third argument, but the District Court resolved it correctly: Alff's trial testimony provided evidence from which the jury could find the insurer knew of and endorsed the conflict.

It may be disputed whether an attorney conflict of interest can support a claim against an insurer under § 8371 — either as a matter of law or as a matter of fact in particular cases — but the parties proceeded through trial assuming § 8371 provides a cause of action for the conduct at issue here. Because Medical Protective did not contest these issues in the District Court, we will not second guess the jury's verdict on these grounds. To do so would deprive Plaintiffs of timely, fair notice of the challenges to their case, and it could require the expenditure of judicial resources that might have been avoided by the presentation of additional evidence at trial, for example, or the use of a

---

[11]Whatever its intent, Medical Protective did not raise the validity of § 8371 claims based on attorney conflicts of interest with sufficient specificity: the District Court only recognized an argument concerning relevancy conditioned on fact, not an argument contesting the cognizability of the claim. Medical Protective could have raised the issue again in its motion for judgment as a matter of law, but in that motion, it contested only the sufficiency of the evidence for bad faith, and only for bad faith failure to tender policy limits, not bad faith representation.

[12]Both the motion *in limine* and the argument on appeal objected to Griffith's testimony, contending its relevancy was conditioned on facts not established. The motion *in limine*, however, only purported to identify a lack of evidence establishing the insurer's knowledge or endorsement of the conflict of interest, not the lack of an evidentiary basis establishing a causal connection between the conflict and harm to Dr. Marcincin. This distinction is significant because evidence attributing knowledge of the conflict to the insurer would differ from evidence establishing any harm the conflict caused.

21

special verdict form. *See Runyon*, 130 F.3d at 571–72. Moreover, we do not believe the waiver results in a miscarriage of justice. Because Alff's testimony established the factual condition to which Medical Protective objected — the knowledge and endorsement of the insurer — and because no other objections were properly raised, Griffith's testimony about the conflict of interest was relevant to the bad faith claim, as it was litigated, against Medical Protective. Accordingly, we will affirm the jury's finding of bad faith.

## III.

### A. Sufficiency of Evidence to Support Jury's Punitive Damages Award

Medical Protective contends there was insufficient evidence for the jury to award punitive damages. Punitive damages may be awarded in Pennsylvania "when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005) (citation and internal quotation marks omitted). "[T]he plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to 'intentional, willful, wanton or reckless conduct.'" *Id.* at 446 (quoting *SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 704 (Pa. 1991)). While a finding of bad faith may, by itself, be sufficient to award punitive damages,[13] the trial court gave Pennsylvania's

---

[13]The Superior Court of Pennsylvania has twice held "that a finding of bad faith permits an award of punitive damages 'without additional proof, subject to the trial court's exercise of discretion.'" *Zimmerman v. Harleysville Mut. Ins. Co.*, 860 A.2d 167,

(continued...)

22

standard jury instruction on punitive damages. *See* Pennsylvania Suggested Standard Civil

Jury Instructions § 14.00. This instruction requires a showing of "outrageous" conduct.

*Id.*

There was sufficient evidence for the jury to find Medical Protective's conduct

outrageous. Alff's testimony demonstrates Medical Protective acted with bad motives, as

it "was trying to play a negotiating tactic against the CAT Fund" in order to save itself

money. Medical Protective recklessly exposed Dr. Marcincin to the risk of an excess

judgment despite knowing the case's value far exceeded $200,000. These actions, along

with Alff's appointment of Kilcoyne despite knowing of Kilcoyne's conflict of interest,

and Alff's failure to appoint separate counsel, constitute outrageous conduct.

### B. Constitutionality of Punitive Damages Award

---

[13](...continued)
174 (Pa. Super. Ct. 2004) (quoting *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 419 (Pa. Super. Ct. 2004)); *see also Thomas v. State Farm Ins. Co.*, 1999 WL 1018279, at *3 (E.D. Pa. 1999) ("Reckless behavior sufficient to support a finding of bad faith under the *Terletsky* test is thus also sufficient to impose punitive damages." (citing *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir. 1994))). In *Polselli*, we found "reckless behavior can constitute bad faith" but did not find that a finding of bad faith is always sufficient to award punitive damages. 23 F.3d at 751.

Section 8371 appears to allow an award of punitive damages based on a finding of bad faith: "In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith towards the insured, the court may . . . [a]ward punitive damages against the insurer." 42 Pa. Cons. Stat. § 8371.

We need not predict how the Pennsylvania Supreme Court would rule on this issue, however, as the District Court required the jury to make a finding of outrageousness, and there is sufficient evidence to support that finding.

Medical Protective contends the jury's punitive damages award is unconstitutionally excessive. We review the constitutionality of punitive damages de novo. *Cooper*, 532 U.S. 424, 436 (2001). "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). To determine whether an award is grossly excessive, the Supreme Court has instructed us to look at three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the [factfinder] and the civil penalties authorized or imposed in comparable cases." *Id.* at 418.

### 1. Reprehensibility

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. We measure reprehensibility by considering whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

24

*Campbell*, 538 U.S. at 419.

With respect to the first and second subfactors, there is no evidence that Dr. Marcincin suffered physical harm or that Medical Protective's conduct "evinced an indifference to or a reckless disregard of the health or safety of others." *Id.* The Jurinkos contend Dr. Marcincin suffered physical harm because he underwent a lengthy trial and suffered embarrassment in his community, but these facts do not constitute physical harm.

The District Court found the last three subfactors relevant to Medical Protective's conduct. The court correctly found Dr. Marcincin financially vulnerable because he would be forced to deplete his life savings to pay the excess judgment.[14] The court found Medical Protective was a recidivist based on (1) its repeated refusal to tender its policy during settlement negotiations despite strong indications that Dr. Marcincin's liability exceeded policy limits, and (2) its assignment of Kilcoyne as counsel. The Supreme Court has examined a defendant's recidivist behavior as it relates to non-parties, not to plaintiffs. *See Gore*, 517 U.S. at 577–79 (defendant's selling of repainted cars as "new" to 1,000 people was considered recidivist conduct). The Court has not considered whether the conduct at issue in a single case can also demonstrate a defendant's recidivism. We have found such conduct "to be relevant, but with less force." *Willow Inn, Inc. v. Pub. Serv.*

_____

[14]For purposes of determining Dr. Marcincin's financial vulnerability, it is irrelevant that Dr. Marcincin was able to assign his bad faith claim to the Jurinkos to avoid paying the excess judgment. Medical Protective acted as it did knowing of Dr. Marcincin's financial vulnerability, and with no knowledge that an assignment of the bad faith claim would save him from financial difficulty.

*Mut. Ins. Co.*, 399 F.3d 224, 232 (3d Cir. 2005); *see also Williams v. Conagra Poultry Co.*, 378 F.3d 790, 798 (8th Cir. 2004) (considering plaintiff's testimony concerning instances in which he experienced racism when looking at defendant's recidivist behavior). *But see Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487 (6th Cir. 2007) ("The repeated conduct factor requires that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff." (citation and internal quotation marks omitted)). There is no evidence that Medical Protective exhibited similar behavior toward other insureds, so any evidence of recidivism will be given less force. *Willow Inn*, 399 F.3d at 232. The record reveals one instance where Medical Protective appointed an attorney with a conflict of interest and several instances where it refused to tender its policy limits during the course of settlement negotiations.

Any evidence of recidivism is limited to the case before us. The conduct in *Willow Inn* provides more compelling evidence of recidivism. Willow Inn brought a property damage claim after the Inn was damaged by a tornado. *Id*. at 227. The insurer, Public Service Mutual Insurance Company ("PSM"), continually delayed the process by, for instance, delaying the hiring of an appraiser until eight months after Willow Inn's initial appraisal request, failing to respond to its own adjuster's correspondence for months, and failing to acknowledge Willow Inn's request for payment for costs incurred repairing a leaky roof despite its clear entitlement to such payments. *Id*. at 227–28, 232. Willow Inn

26

did not recover full payment until two years after the claim was made. *Id*. at 228. The district court found bad faith on the part of PSM:

> "[U]nreasonable delays in the processing of the Willow Inn's claims were extraordinarily unwarranted such that there can be no conclusion except that PSM knowingly or recklessly disregarded the absence of a reasonable basis for its conduct. The record is replete with examples of PSM's failure to respond in a timely fashion to Willow Inn's various reasonable requests, and even to the requests of those working on PSM's behalf."

*Id*. at 229 (quoting the district court). PSM's repeated delay caused increasing harm to Willow Inn, which needed payment of the claim to repair the property damage. But here delays caused Dr. Marcincin no harm. Although Medical Protective's failure to settle ultimately amounted to bad faith, initial refusals to settle at a certain amount during the course of settlement negotiations do not demonstrate recidivism. Therefore, the recidivism subfactor points only minimally, if at all, in the Jurinkos' favor.

The harm Dr. Marcincin suffered was the result of Medical Protective's intentional conduct, not accident. Alff knew his appointment of Kilcoyne to represent both physicians would create a conflict of interest. He also testified that he intentionally refused to tender Dr. Marcincin's policy in order to force the CAT Fund to pay more from Dr. Edelman's policy. Medical Protective's bad faith conduct was intentional, and Dr. Marcincin was financially vulnerable. But there is no evidence of the first two factors and scant evidence of recidivism.

### 2. Ratio Between Harm and Punitive Damages Award

27

While we cannot "'draw a mathematical bright line between the constitutionally acceptable and constitutionally unacceptable [award], . . . [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus.'" *Gore*, 517 U.S. at 583 (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991)). The Supreme Court has set forth instructive principles. First, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425. Second, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Haslip*, 499 U.S. at 23–24). Third, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."[15] *Id.* While helpful, "[t]hese statements do not compel a particular result in this case, as they are not holdings of the Court." *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 156 (6th Cir. 2007). "The precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell*, 538 U.S. at 425.

---

[15]The Supreme Court recently found that a punitive damages award may not exceed a 1:1 ratio in the context of maritime law. *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2633 (2008). The Court did not directly address constitutional limits. *See id.* at 2626 ("[W]e are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard."). However, the Court again said that, when punitive damages are substantial, "the constitutional outer limit may well be 1:1." *Id.* at 2634 n.28.

Here, the ratio is 3.13:1.[16] High ratios do not violate due process if "a particularly

egregious act has resulted in only a small amount of economic damages," or if "the injury

is hard to detect or the monetary value of noneconomic harm might have been difficult to

determine." *Id.* (quoting *Gore*, 517 U.S. at 582). Here the compensatory damages are

substantial, Dr. Marcincin suffered only economic harm, and the harm was easily

measured — it was the amount of the excess judgment. *See id.* Medical Protective's acts

were egregious, but not likely "particularly" egregious. *Campbell* counsels, under these

circumstances, that only a lesser award satisfies due process. *Id.*

Other courts have used a 1:1 ratio as a benchmark where compensatory damages

are substantial. *See Bridgeport Music, Inc.*, 507 F.3d at 488, 490 ("[A] ratio of closer to

1:1 or 2:1 is all that due process can tolerate" where the compensatory damages award was

already substantial — $366,939 — and the original award had a ratio of 9.5:1); *Williams v.

Conagra Poultry Co.*, 378 F.3d 790, 796–99 (8th Cir. 2004) (reduced punitive damages

award from an approximately 10:1 ratio to a 1:1 ratio because plaintiff received substantial

compensatory damages — $600,000); *Slip-N-Slide Records, Inc. v. TVT Records, LLC,*

No. 05-21113-CIV, 2007 WL 3232274, at *30 (S.D.Fla. Oct. 31, 2007) (affirming a

---

[16]In calculating this ratio, we include attorneys' fees and costs as part of compensatory damages. In *Willow Inn*, we found the Pennsylvania Supreme Court would adopt the view of the Superior Court in *Hollock v. Erie Ins. Exch.*, 842 A.2d 409 (Pa. Super. Ct. 2004) (en banc), which considered attorneys' fees and costs awarded pursuant to § 8371 for purposes of calculating the ratio. *Willow Inn*, 399 F.3d at 236; *see also Action Marine, Inc. v. Cont'l Carbon, Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) ("In Georgia, awards of attorney fees in tort cases involving bad faith are compensatory in nature.").

punitive damages award, which had been reduced to reflect a 1:1 ratio by the District Court, because the "substantial [compensatory damages award of $2.3 million] mitigates against a punitive damages award that materially exceeds that same amount"); *Zakre v. Norddeutsche Landesbank Girozentrale*, 2008 WL 351662, at *7 (S.D.N.Y. Feb. 8, 2008) (reducing a punitive damages award, where the ratio was 2:1, because compensatory damages were substantial — $1.65 million); *Thomas v. Istar Fin., Inc.*, 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007) ("[T]he Court believes the [3:1 to 4:1] ratio in this case is excessive because Thomas was awarded a very substantial amount in compensatory damages [$443,500], making a punitive award equal to the compensatory damage award more appropriate."); *see also, Action Marine, Inc.*, 481 F.3d at 1317–23 (affirming a punitive damages award with a 5:1 ratio, based on a $3.2 compensatory damage award, in which there was physical, not just economic harm, as well as harm to many non-parties). In *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594 (8th Cir. 2005), a jury awarded $4.025 million in compensatory damages and $15 million in punitive damages in favor of a smoker's husband, who sued Brown & Williamson Tobacco for a design defect in its product. *Id*. at 598. The Eighth Circuit reduced the punitive damages award to $5 million, approximately a 1:1 ratio. *Id*. at 602–04. The court found, despite a strong showing of reprehensibility, that the 3:1 ratio was "excessive when measured against the substantial compensatory damages." *Id*. at 603. There, the factors that justify a higher ratio were absent — those same factors are absent here. *Id*. The court said, "despite evidence that [the defendant] exhibited a callous disregard for the adverse health

30

consequences of smoking, there is no evidence that anyone at American Tobacco intended to victimize its customers." *Id.* Similarly, Medical Protective demonstrated bad faith by failing to act in Dr. Marcincin's best interests, but the evidence does not show it intended to victimize him. In light of the substantial compensatory award and the harm being exclusively economic, this guidepost advises a reduced award.

3. Disparity Between Punitive Damages Award and Civil Penalties

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 583. This guidepost, which "should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue," *id.*, "provides notice of possible sanctions to potential violators," *Willow Inn*, 399 F.3d at 237. The District Court relied on *Willow Inn*, in which we upheld a punitive damages award where the insurer's bad faith conduct "arguably amounted to multiple violations of 40 Pa. Stat. Ann. § 1171 [of Pennsylvania's Unfair Insurance Practices Act ("UIPA")]." *Id.* at 237–38. The UIPA "regulate[s] trade practices in the business of insurance" by setting forth the unfair or deceptive practices prohibited in Pennsylvania. 40 Pa. Stat. Ann. § 1171.2. The Commissioner may seek a penalty of up to $5,000 for each violation of the UIPA. *Id.* § 1171.11(1). The Commissioner may also suspend or revoke the offender's license. *Id.* § 1171.9. Section 1171.5(a) sets forth two relevant "unfair or deceptive acts or practices" punishable by fine or suspension or revocation of the insurer's license:

31

(vi) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

(xiii) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage or under other policies of insurance.

*Id*. § 1171.5(a)(10)(vi), (xiii). In *Willow Inn*, we did not overturn the punitive damages award despite punitive damages outnumbering the civil penalty 30:1. *Willow Inn*, 399 F.3d at 237–38. We were unwilling to overturn the award solely based on this third guidepost because we were "unsure as to how to properly apply" it. *Id*. at 238. Furthermore, the insurer's conduct could have amounted to multiple violations of § 1171, which could also have led to suspension and revocation of one's license to issue insurance policies. *Id*.

Section 1171 provides notice to violators of possible sanctions. It also reveals a substantial disparity between the punitive damages award and the civil penalty. While we found the 30:1 disparity in *Willow Inn* insufficient to overturn the punitive damages award in light of the confusion surrounding this guidepost, we face a disparity here of 1250:1. While courts do not focus on the ratio under this factor, the District Court failed to consider that, although the award in *Willow Inn* was $150,000, the award here is $6.25 million, putting a discussion of civil penalties on a different footing. In *Gore*, the Supreme Court said a statute imposing sanctions of up to $10,000 for deceptive trade practices could not provide a potential offender notice that it might be subject to a multimillion

32

dollar penalty. *Gore*, 517 U.S. at 584. While the potential exists for a suspension or revocation of Medical Protective's license to sell insurance, the large punitive damages award appears excessive in light of the comparatively modest monetary sanctions imposed for such conduct. Section 1171 is unlikely to provide an insurer with fair notice of a $6.25 million award. Although the outrageous conduct that occurred here is unlikely to be deterred by the statutory penalties in § 1171, the third guidepost suggests the award was excessive.

### 4. *Conclusion*

Consideration of the guidelines leads us to conclude that the punitive damages award should be reduced. Medical Protective's conduct does not justify so high an award in light of the moderate degree of reprehensibility, the substantial compensatory award, and the large disparity between the award and civil penalties under § 1171. Only two of the reprehensibility factors point strongly toward reprehensible conduct, because little, if any, evidence of recidivism exists. With regard to the proper ratio, the Supreme Court has instructed that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell*, 538 U.S. at 425. We believe, in light of our consideration of all three guideposts, the Supreme Court's statement instructs the outcome here. Accordingly, we will reduce the award to reflect a 1:1 ratio.

IV.

33

The Jurinkos appeal the order of the District Court, which granted in part and denied in part the Jurinkos' motion to mold the verdict. First, the Jurinkos contend the District Court erred by refusing to award bad faith interest under § 8371. Second, they contend the District Court erred by using the lodestar method rather than the percentage-of-recovery method to calculate attorneys' fees. Because the District Court properly found the Jurinkos waived their right to bad faith interest, and because the District Court properly used the lodestar method to calculate attorneys' fees, we will affirm.

### A. Bad Faith Interest

Section 8371 permits courts to "[a]ward interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%." 42 Pa. Cons. Stat. § 8371(1). "If the correct legal standards are applied and the findings of fact are not clearly erroneous, the reasonableness of a fee award is reviewed only for abuse of discretion." *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 533 n.11 (3d Cir. 1997). The District Court instructed the jury on a stipulation reached by the parties with regard to compensatory damages: "The financial losses include the portion of the $2.5 million verdict that exceeded Dr. Marcincin's insurance coverage, together with delay damages and interest on that amount, for a total of $1,658,345." The post-judgment interest from this stipulation amounted to $286,315.22. It was calculated at a rate of 6 percent simple interest, accruing from April 26, 2002, to October, 18, 2005, on the $1,372,030.04 excess verdict. The District Court found, because the parties stipulated to

34

an award of interest during trial, the Jurinkos waived their ability to recover statutory interest under § 8371(1).

The Jurinkos contend they did not waive their right to interest equal to prime plus 3%. The Jurinkos point to the following exchange during the bad faith trial regarding the stipulation and post-judgment interest:

> Mr. Tanner [Jurinkos' counsel]: And similarly, the statutory provision again under 8371 that reflects the amount of interest to be added to any award would also be something that the Court could calculate. And we would do that by way of post-trial motion, in the event we are successful.
>
> Mr. Lerman [Medical Protective's counsel]: And our pretrial statement reflects that we agree to that also, Your Honor.
>
> The Court: Very well.

But this statement can be read consistently with the stipulated compensatory damages and the additional interest the District Court awarded upon the Jurinkos' post-trial motion to mold the verdict. The stipulated compensatory damages included an award of interest based on the amount of the excess verdict ($1.3 million) and delay damages ($72,030.04). The interest was calculated from April 26, 2002, the date of the excess verdict, to October 18, 2005, at a rate of six percent. In its order granting in part the Jurinkos' motion to mold the verdict, the District Court awarded interest from October 19, 2005, through the date of the order, at a rate of prime plus three percent under § 8371(1).

That the Jurinkos waived their right to additional interest is made clear by their calculation of interest. In order to award interest under § 8371, the Jurinkos ask us to award interest at prime plus three percent, then subtract any interest already recovered as

part of the compensatory award.  The interest awarded in the compensatory award was intended to comprise all of the interest the Jurinkos were entitled to for the period of April 26, 2002, through October 18, 2005, with the Jurinkos free to move for additional interest based on the period following October 18, 2005.  The District Court, in its discretion, awarded interest at prime plus three percent for the period from October 19, 2005, through the date of the order.  We have explained that, in the context of § 8371, interest is awarded "to make the successful plaintiff completely whole."  *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 236 (3d Cir. 1997).  By stipulation, the parties determined what amount would make Dr. Marcincin whole.  The Jurinkos are therefore not entitled to additional interest beyond that already awarded.

### B.  Attorneys' Fees

Section 8371 also permits a court to "[a]ssess court costs and attorney fees against the insurer."  42 Pa. Cons. Stat. § 8371(3); *Polselli*, 126 F.3d at 529, 533–34.  "The question of what standard to apply in calculating attorney's fees and costs is a legal question and is subject to plenary review."  *Polselli*, 126 F.3d at 533.  "If the correct legal standards are applied and the findings of fact are not clearly erroneous, the reasonableness of a fee award is reviewed only for abuse of discretion."  *Id*. at 533 n.11.  As with awarding interest, attorneys' fees are awarded to make the plaintiff whole.  *Klinger*, 115 F.3d at 236.

In its motion to mold the verdict, the Jurinkos requested $2,372,503.50 in attorneys' fees — thirty percent of the verdict.  This amount reflects the Jurinkos' contingency fee

agreement with their counsel and is calculated according to the percentage-of-recovery

method, which awards fees as a fixed portion of the verdict. The Jurinkos contend courts

may choose between the percentage-of-recovery method or the lodestar method. We have

predicted how the Pennsylvania Supreme Court would calculate attorneys' fees in bad

faith insurance claims. In *Polselli*, we determined a trial court must consider the factors

set forth in Pennsylvania Rule of Civil Procedure 1716. *Polselli*, 126 F.3d at 534. [17]

While the Pennsylvania Supreme Court has not addressed this issue, the Pennsylvania

Superior Court adopted this approach. *See Birth Ctr.*, 727 A.2d at 1160. A calculation of

attorneys' fees under Rule 1716 begins with the lodestar method. *Id*.

The Jurinkos cite to common fund cases for the proposition that we should adopt

the percentage-of-recovery method. *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales*

*Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998). *Prudential Insurance Co.* sets out

when each method is appropriate:

> The percentage-of-recovery method is generally favored in cases involving a
> common fund, and is designed to allow courts to award fees from the fund in
> a manner that rewards counsel for success and penalizes it for failure. The
> lodestar method is more commonly applied in statutory fee-shifting cases,

---

[17]Rule 1716 requires a court, which is entitled to award attorneys' fees, to consider the
following factors:
    (1) the time and effort reasonably expended by the attorney in the litigation;
    (2) the quality of the services rendered;
    (3) the results achieved and benefits conferred upon the class or upon the
    public;
    (4) the magnitude, complexity and uniqueness of the litigation; and
    (5) whether the receipt of a fee was contingent on success.
Pa. R. Civ. P. 1716.

and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation.

*Id.* (internal citations and quotations omitted). Section 8371 is a fee-shifting statute. Therefore, the use of the lodestar method is appropriate. This conclusion is supported by the fact that no court has adopted the percentage-of-recovery method to calculate attorneys' fees under § 8371.

The Jurinkos contend that use of the lodestar method requires creating "a fictional scenario whereby an attorneys' fee is calculated based upon an hourly rate in a bad faith case" when, in fact, most attorneys undertake a bad faith case on a contingency fee. Jurinkos' Br. at 76. But Rule 1716 allows courts to consider whether a "contingency enhancement" is appropriate based on the facts of a given case. *Polselli*, 126 F.3d at 535–36; *Birth Ctr.*, 727 A.2d at 1161. In fact, the District Court examined whether a contingent risk required an enhancement of the lodestar amount. The court found any risk of contingency — based on the complexity of the case, for example — was "reflected in the overall hours worked and rates charged by Plaintiffs' attorneys." Because courts consider the increased risk of contingency fees under Rule 1716, its use here is both fair and appropriate.

For these reasons, Rule 1716 governs the calculation of attorneys' fees in a § 8371 case. The District Court did not err by adopting Rule 1716 and the lodestar method to calculate attorneys' fees. The Jurinkos do not contend the District Court improperly

38

calculated attorneys' fees under the lodestar method. Regardless, "the determination of a reasonable fee is an inherently case-specific endeavor," *Polselli*, 126 F.3d at 535–36, and the District Court did not abuse its discretion in calculating the appropriate fee.

V.

Accordingly, we will affirm the judgment entered on the verdict and, because we find the punitive damages award unconstitutionally excessive, reduce the punitive damages award to $1,996,950.56. We will also affirm the District Court's order affirming in part and denying in part the Jurinkos' motion to mold the verdict.